## LAURICELLA v. UNITED STATES et al.

### No. 24, Docket 21679.

United States Court of Appeals Second Circuit.

Argued Oct. 31, 1950.

Decided Nov. 29, 1950.

See also 84 F.Supp. 361.

Eugene Peleyger, Brooklyn, N. Y., for appellant; William L. Standard and Louis R. Harolds, New York City, of counsel.

Irving J. Saypol, U. S. Atty., and Kirlin Campbell Hickox & Keating, New York City, for appellee; Walter X. Connor and Vernon Sims Jones, of New York City, of counsel.

Before L. HAND, Chief Judge, and SWAN and FRANK, Circuit Judges.

SWAN, Circuit Judge.

This is a suit in admiralty to recover for personal injuries sustained by a hatch foreman in the employ of a steve-

doring company which was under contract with the United States to load stores into a troop ship, while docked at Pier 20 in the East River on October 11, 1945. The case was tried before Judge Bright who reserved decision but died before determining it. By stipulation of the parties the record made before Judge Bright was submitted to Judge Hulbert for decision. He wrote an opinion (unreported), made findings of fact, and dismissed the libel on the ground that the libellant had failed to sustain the burden of proving "by a fair preponderance of the credible evidence" negligence on the part of the United States.[1] The appeal seeks reversal of this conclusion. Fundamentally decision must turn on the credibility of witnesses; and we are as well able to pass upon credibility as was Judge Hulbert who neither saw nor heard the witnesses.[2]

There is no dispute at to the happening of the accident to Lauricella. He fell from the 'tween deck of No. 1 hatch into the hold. The first mate of the vessel had removed a hatch cover, 30 inches in width by 48 inches in length, above the ladder leading from the 'tween deck into the hold and had left it off in order that the fresh water tanks in the hold might be inspected to see whether they were leaking. Lauricella descended the companionway ladder from the port side of the deck to the 'tween deck of hatch No. 1 in search, as he says, of a piece of rope to use in connection with the sling or net by which the stores were being laden into hatch No. 4. When he reached the bottom of the ladder he turned to the right and started walking across the hatch. After taking several steps he tripped over something and fell through the opening, which he had not noticed, made by the removal of the hatch cover. He testified that there was enough light in the 'tween deck to see clearly and that he did not watch where he was placing his feet.

■■ Relying upon Badalamenti v. United States, 2 Cir., 160 F.2d 422, the appellant contends that the facts above stated, without more, prove negligence on the part of the shipowner. In that case the shipowner was held liable to a stevedore who went in search of a rope in an unlighted portion of the lower 'tween deck and fell into an open hatch adjacent to the one in which he was working and only about 50 feet distant therefrom. The basis of that decision, 160 F.2d at page 425, was that "it was reasonable to foresee" that the stevedores "might have occasion to go to parts of the deck that were not lighted in pursuit of their calling." That principle is inapplicable here. The stores were to be loaded only in hatch No. 4 which was far removed from hatch No. 1; and the stevedoring company, not the ship—unlike the vessel involved in the Badalamenti case—was to furnish such rope as was needed for the work to be done by the stevedores. Under these circumstances we do not think the shipowner could reasonably anticipate that a stevedore would go to the 'tween deck of hatch No. 1 "in pursuit of their calling." The shipowner owed the stevedores, as invitees or business visitors, the duty to provide a reasonably safe place in which to do their work.[3] But that duty is confined to those parts of the ship to which the "invitee" may reasonably be expected to go. His status as a business visitor is lost if he goes elsewhere, for he then becomes no more than a licensee or perhaps even a trespasser. See Bollinger v. Gotham Garage Co., 2 Cir., 155 F.2d 326; Pryotely v. New York C. & St. L. R. Co., 6 Cir., 28 F.2d 868. Hence recovery in the case at

1. The vessel was operated by American South-African Line, Inc. under the standard form of general agency contract, and the suit was brought against this corporation as well as the United States. With consent of libellant's proctor the libel was dismissed as against the general agent.

2. Sawyer v. McDonald, 5 Cir., 165 F.2d 426; Crist v. United States War Shipping Administration, 3 Cir., 163 F.2d 145. See also Bowles v. Beatrice Creamery Co., 10 Cir., 146 F.2d 774, 780; Letcher County v. De Foe, 6 Cir., 151 F.2d 987, 990; Banister v. Solomon, 2 Cir., 126 F.2d 740, 742; Orvis v. Higgins, 2 Cir., 180 F.2d 537, 538; Dollar v. Land, D.C.Cir., 184 F.2d 245, 248-9.

3. Anderson v. Lorentzen, 2 Cir., 160 F.2d 173.

bar must depend upon the libellant's testimony that the first mate told him to go to hatch No. 1 to get a rope. Indeed the principal contention on appeal is that Judge Hulbert erred in not accepting this testimony.

Pier 20, owned by the City of New York, consisted of a one story shed, the sides of which were only two feet from the stringpiece. The stores were brought by trucks into the shed. The roof of the shed was in a dilapidated condition with a hole therein about 6½ feet wide by 19 feet long between the steel beams which supported the roof. Lauricella, who was in charge of the stevedores, decided that the work of loading should be done by lifting the stores in a sling or net through the hole in the roof. Accordingly, the Burton boom for hatch No. 4 was rigged to drop its fall directly through this hole and the up and down boom was rigged to drop its fall into No. 4 hatchway. Loading operations began about 1:20 P.M. According to Lauricella's testimony, after the work had gone on for slightly more than an hour difficulties developed due to the fact that the tide had fallen about a foot and a half. He thereupon sought out the first mate who was on the bridge and asked him to move the ship forward a few feet; this the mate refused to do, and Lauricella then suggested that he might overcome the difficulty by using a piece of rope, somewhat like a purse string, to shorten the distance between the hook of the Burton fall and the bottom of the net; the first mate then said that rope could be found in hatch No. 1, and accordingly Lauricella, followed by his gangway man LaCava, immediately descended the companionway ladder into the 'tween deck of hatch No. 1 in search of the rope. LaCava corroborated Lauricella's story as to his conversation with the first mate. But Balken, the first mate, flatly denied that he ever talked with Lauricella, and he was corroborated by the third mate, Sawyer, who said he was with the first mate in the latter's room "for quite some time" before the accident. The mates also testified that ropes were kept in the bosun's locker in the forepeak. All the hatches, except No. 4, were fitted with bunks in the 'tween deck to accommodate troops to be brought back from Europe. It seems most improbable that Balken, if he had had a conversation about rope with Lauricella would not have directed the latter to seek it in the bosun's locker rather than in so unlikely a place as hatch No. 1 'tween deck. Conceivably there might have been an odd coil of rope lying there, but no one testified that any rope was in that hatch and after the accident LaCava obtained the desired piece of rope from his employer's storeroom on the adjacent Pier 19. On the other hand, it is difficult to conceive why Lauricella and LaCava went into hatch No. 1 unless they were looking for rope. That one of them gave that reason for being there is evident from the Master's letter of October 12, 1945. Balken testified that he or Sawyer gave the Master the information that the injured stevedore "claims he was looking for some line." From whom they got the information does not appear. Lauricella's credibility was somewhat impeached by false statements about his earlier accident in 1944 and LaCava's by his incorrect account of how Lauricella was brought out of the hold after his accident. Indeed, the mathematical computations of the shipowner's expert witness, based on the length of the Burton boom and the angle at which it was rigged, raise doubt that the falling of the tide by only a foot and a half could actually have created the difficulty in loading as to which Lauricella and LaCava testified. From a reading of the entire record, we find no reason to disagree with Judge Hulbert's conclusion that the libellant did not sustain his burden of proving negligence on the part of the shipowner.

Decree affirmed without appellate costs to either party.