CHAS. D. BRIDDELL, Inc. v. ALGLOBE TRADING CORP. et al.

No. 144, Docket 22217.

United States Court of Appeals Second Circuit.

Argued Dec. 14, 1951.

Decided Jan. 21, 1952.

418

Fennelly, Eagan, Nager & Lage, New York City (Charles J. Nager and Seymour Stein, New York City, of counsel), for plaintiff-appellee.

Maurice V. Seligson and Asher Blum, all of New York City (Mock & Blum, New York City, of counsel), for defendants-appellants.

Before CHASE, CLARK and FRANK, Circuit Judges.

FRANK, Circuit Judge.

From our examination of the knives and containers, and the other exhibits, we think there is, to say the least, considerable doubt whether, on this record, there was marked creativeness in the appearance of plaintiff's knives (made in the well-known form of a hunting knife) or of the containers, or in putting such knives in such containers. But we shall assume, arguendo, that the plaintiff's design was unquestionably unique and the result of genius. Even on that assumption, we think that, without more, plaintiff was not entitled to a preliminary injunction. Our reasons follow:

■ In the first place, we regard the following as well settled.[1] The fact that the design of an article is strikingly novel and beautiful, and the fact that its first producer has spent large sums in advertising which has made the article popular with consumers, give that first producer no rights against others who subsequently imitate it and (taking advantage of the consumer-popularity· of the article, due to the first producer's advertising) sell it competitively—unless the first producer has a monopoly based upon (1) a patent on the design or (2) a so-called secondary meaning. Absent (1) and (2), the first producer has no legal complaint because the imitators have been enriched by his efforts, have enjoyed what is known as a "free ride." For the common law favors competition; and it is of the essence of competition that competitors copy and undersell the product of an originator. The competitors do not lose their favored common-law position merely because someone chooses to call them "free riders." To have protection from such competition, the originator must possess some sort of monopoly.

In General Time Instrument Corp. v. United States Time Corp., 2 Cir., 165 F.2d 853, at page 855 where plaintiff had sold al-

1. See, e.g., Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 247 F. 299; A. C. Gilbert v. Shemitz, 2 Cir., 45 F.2d 98; Electric Auto-Lite Co. v. P. & D. Mfg. Co., 2 Cir., 109 F.2d 566, 567; Lewis v. Vendome Bags, Inc., 2 Cir., 108 F.2d 16; Swanson Mfg. Co. v. Feinberg-Henry Mfg. Co., 2 Cir., 147 F.2d 500, 503; Lucien Lelong, Inc. v. Lander, Inc., 2 Cir., 164 F.2d 395, 397; General Time Instrument Corp. v. United States Time Corp., 2 Cir., 165 F.2d 853, 854-855; Zangerle & Peterson Co. v. Venice Furniture Novelty Co., 7 Cir., 133 F.2d 266.

most 3,000,000 of its clocks and had spent about $2,000,000 in advertising the same from 1939 to 1946, we said: "This measures plaintiff's efforts to establish a secondary meaning, but does not determine its success. * * * Large expenditures for advertising do not compel a conclusion that the task has been accomplished." We also said: "The copying of an unpatented design does not in itself constitute unfair competition." [2]

■ To obtain a valid design patent is exceedingly difficult.[3] Probably that explains why plaintiff did not even apply for a patent. Had the statute permitted the procuring of a design copyright and had plaintiff procured one, defendants' conduct in deliberately copying plaintiff's design would have been actionable. But plaintiff has no such copyright. And there is no such thing as a common-law design copyright. That is understandable. For such a copyright, not created under congressional legislation, would be free of the constitutional provision limiting the life of a copyright, and would be a perpetual monopoly.

■ Accordingly, an injunction could be proper here only if plaintiff showed that it

had acquired a "secondary meaning" in the design of its knives, or containers—*i.e.*, showed a likelihood that purchasers of defendants' products would believe that they came from the same source as plaintiff's. (Of course, it would suffice to show such a likelihood; proof of actual instances of confusion is not required.) As this court, per Judge Learned Hand, has said, it "is an absolute condition to any relief whatever that the plaintiff in such cases show that the appearance of his wares has in fact come to mean that some particular person—the plaintiff may not be individually known—makes them, and that the public cares who does make them, and not merely for their appearance and structure. * * * The critical question of fact at the outset always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source. Unless the plaintiff can answer this question he can take no step forward;·no degree of imitation of details is actionable in its absence." [4] And this is true, we have said, even if the defendant copies "slavishly" [5] or "down to the last detail." [6]

2. "Without [secondary meaning] or patent protection it was not unfair competition merely to copy the plaintiffs' purses and sell duplicates of them"; Swanson Mfg. Co. v. Feinberg-Henry Mfg. Co., 2 Cir., 147 F.2d 500, 503.

3. See, e.g., A. C. Gilbert Co. v. Shemitz, 2 Cir., 45 F.2d 98, 99; Neufeld-Furst & Co. v. Jay-Day Frocks, 2 Cir., 112 F.2d 715, 716; Nat Lewis Purses v. Carole Bags, 2 Cir., 83 F.2d 475, 476; White v. Leanore Frocks, Inc., 2 Cir., 120 F.2d 113, 115; Alfred Bell & Co. v. Catalda Fine Arts, 2 Cir., 191 F.2d 99, 104.

4. Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 247 F. 299, 300.
In Zangerle & Peterson Co. v. Venice Furniture Novelty Co., 7 Cir., 133 F.2d 266, 270, the court said (per Judge Minton): "To establish secondary meaning, the article itself must be so clearly identified with its source that its supply from any other source is clearly calculated to deceive the public and lead it to purchase the goods of one for that of another. * * * To acquire a secondary meaning

in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, 'That is the article I want because I knew its source,' and not the negative inquiry as to, 'Who makes that article?' In other words the article must proclaim its identification with its source, and not simply stimulate inquiry about it."

5. In A. C. Gilbert v. Shemitz, 2 Cir., 45 F.2d 98, 99, we said that "the designs are so similar" that there would have been an infringement if the plaintiff's patent had been valid. Holding it invalid, we turned to the claim of unfair competition, saying that defendants have "the right to copy the * * * design slavishly so long as they [do] not represent that the goods sold were those of the complainant."

6. See Electric Auto-Lite Co. v. P. & D. Mfg. Co., 2 Cir., 109 F.2d 566, 567: "There is nothing unlawful in copying the unpatented products of another dealer down to the last detail, except in so far as the resulting similarity may become a

■■■ The record contains nothing but affidavits and exhibits. We are in as good a position as the trial judge to evaluate such evidence.[7] We think it does not suffice to establish the essential likelihood of consumer-confusion as to source. Standing alone, deliberate copying of the appearance of plaintiff's product (while omitting plaintiff's trademark, legend and name) does not prove such likelihood. The only significant evidence tending so to prove consists of unsworn statements found in two letters sent to plaintiff.[8] For reasons stated above, there is no evidence of consumer-confusion in the affidavit of one Hussey (an experienced manufacturer's representative) that plaintiff's knives had had "a tremendous consumer-reception" and that defendants ("new competitors") were offering a product which they claimed to be and which was similar to plaintiff's at a substantially lower price, with the consequence that jobbers were withholding orders for plaintiff's knives. For this affidavit served to show merely that defendants began actively to compete with the plaintiff, and not at all that consumers were confused or likely to be confused as to source.[9] We conclude

---

means of securing his customers through their belief, so induced, that your goods are his."

7. We have so held as to written evidence, even after a trial on the merits. See, e.g., Lauricella v. United States, 2 Cir., 185 F.2d 327, 328; Luckenbach S. Co. v. United States, 2 Cir., 157 F.2d 250, 251; Kind v. Clark, 2 Cir., 161 F.2d 36, 46; The Coastwise, 2 Cir., 68 F.2d 720, 721; Stokes v. United States, 2 Cir., 144 F.2d 82, 85; Norment v. Stilwell, 2 Cir., 135 F.2d 132; Pfeifer Oil Trans. Co. v. The Ira S. Bushey, 2 Cir., 129 F.2d 606, 607; Bannister v. Solomon, 2 Cir., 126 F.2d 740, 742. See also Bowles v. Beatrice Creamery Co., 10 Cir., 146 F.2d 774, 780; Equitable Life Assurance Society of United States v. Irelan, 9 Cir., 123 F.2d 462, 464; Dollar v. Land, 87 U.S.App. D.C. 214, 184 F.2d 245, 248–249; Moore, Federal Practice (2d ed. 1951) § 52.04.

8. One of these letters, from a distributor to plaintiff, refers to the writer's attendance at the "annual show" of a wholesaler, and adds: "They certainly have a well-rounded display and have given nice prominence to Carvel Hall Cutlery, having placed it on an excellent stand at the entrance to the display-room. So far the show has been well attended and sales have been fairly good. Up to this time I had not seen any of the products of the firms against whom you have just entered suit, but Malco happened to have one of the Oxhead Steak Knive Sets, and I was amazed at the way this outfit has copied your product. It is so exactly similar that on numerous occasions at the show, various people were heard to say, 'What is that set of Carvel Hall Cutlery doing down this end of the room. It should be back with the balance of the line.' For your information, it was placed seven or eight stalls down from the Carvel Hall Display.

"Upon examination, it is so easy to determine that it is quite an inferior product to Carvel Hall Cutlery, and carrying a much lower price, the trade have been continually inquiring as to why Carvel Hall has to be priced so much above what to their eyes seems to be the identical thing.

"Everyone to whom I spoke agreed that you have taken the correct action, and their best wishes are with you."

The other letter, from a Long Island, New York, dealer to plaintiff, reads (so far as pertinent) as follows: "I am a little concerned about the guys who copied your steak knives, and have had many people tell me that they could buy your knives at $10.00 per set of 6, I could not believe this possible, and only got a clear picture when the factory sent me pertinent details of the infringement. I trust that this gives you a clear picture of what I would like to do regarding Briddell product, and would like to know if the other knives are still being sold by the other people, or if they have been re-stained, otherwise it will certainly slow the sales of Briddell considerably. Let me hear from you soon."

9. One Wright, in an affidavit, says: "General appearance, size, shape and color of the two brands of knife sets as displayed in their plastic cases are so nearly identical that at first glance they would appear to be the same product. The only obvious difference between the two sets laid side by side is the Carvel Hall name imprinted on the transparent cover of one, with no brand name showing on the other cover. There is a bas-relief plastic symbol of a doorway on the Carvel Hall cover and a bas-relief plastic symbol of an oxhead on the other." This is far from saying or showing that there is a likelihood that customers will believe that plaintiff's and defendants' products

that the trial judge's findings, so far as they relate to consumer-confusion, have no adequate support in the record, and that, therefore, the preliminary injunction should not have issued.[10] Of course, we do not prejudge the case as it may develop in a trial on the merits.

■■ We have no occasion to consider whether the Lanham Act, 15 U.S.C.A. § 1126(h, i) applies here. This circuit has not yet decided whether that Act creates a new federal right against "unfair competition." See Cutting Room Appliance Corp. v. Empire Cutting M. Co., 2 Cir., 186 F.2d 997.[11] But even if we assume, arguendo, that the Act does apply, we think that it cannot affect our conclusion: Under the Act, the likelihood of consumer-confusion remains, just as theretofore, the test of secondary meaning. S. C. Johnson & Son v. Johnson, 2 Cir., 175 F.2d 176, 180. And we believe that the Act does not enlarge the common-law meaning of "unfair competition" so as to give rise to a secondary-meaning right where the likelihood of consumer-confusion is not proved. "Unfair competition" are words of art; and, when the legislature borrows such words, they are deemed to retain their previous meaning unless there is a contrary legislative intention clearly expressed in the statute or its history. See Hoffman v. Palmer, 2 Cir.,

129 F.2d 976, 983; Case v. Los Angeles Lumber Co., 308 U.S. 106, 115, 60 S.Ct. 84 L.Ed. 110; Keck v. United States, 172 U.S. 434, 446, 19 S.Ct. 254, 43 L.Ed. 505; United States v. Wong Kim Ark, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890; Morissette v. United States, 72 S.Ct. 240.

Reversed.

CLARK, Circuit Judge (dissenting).

The opinion herewith appears to go on grounds of both substance and procedure. If, and as, it is a ruling that the rather drastic remedy—under the circumstances here—of an injunction should issue only upon more "live" testimony than is here, I should be disposed to go along, provided a speedy hearing was directed and adequate safeguards were required meanwhile to hold the matter in statu quo. For it must be borne in mind that the evidence, whatever it was, stood unchallenged on the issue here crucial[1] except for our own judicial notice of the subject of cutlery and it was sufficient to convince an experienced and cautious trial judge. It should not therefore be disregarded while we are searching for a more complete case—particularly when we are faced with the deliberate copying of a widely advertised product, to sell a depreciated article at half price. The absence, however, of any suggestions for

---

were made by the same manufacturer. See, e.g., A. C. Gilbert v. Shemitz, 2 Cir., 45 F.2d 99, 100; "It is to be remembered that the defendants would have the right to copy the Gilbert design slavishly so long as they did not represent that the goods sold were those of the complainant."

10. Plaintiff put in evidence copies of advertisements, by what plaintiff calls "reputable department stores," of defendants' product. Plaintiff argues that these advertisements were likely to mislead consumers. But, all else aside, there is no proof that defendant was responsible for this advertising; and there is good reason to believe that those stores knew that defendants' products did not come from the same source as plaintiff's.

11. In Dad's Root Beer Co. v. Doc's Beverages, Inc., 2 Cir., 193 F.2d 77, a majority of the court did not think it necessary to decide whether the Lanham Act was applicable, and, on that ground, did not join

in the discussion of that Act by one member of the court.

1. That of secondary meaning and consumer-confusion. The opinion is in error in stating that the two illustrative letters which are quoted were the only significant evidence of consumer-confusion. More important was the affidavit of Hussey, president of R. P. Hussey Associates, for forty years a manufacturers' representative, that customers, department store buyers, and others interested in plaintiff's line were inquiring as to this 55-per-cent-cheaper product and jobbers were holding off from placing further orders. Doubtless Hussey should be subjected to cross-examination, but his statement should not be either ignored or limited as in the opinion. Of some importance, too, is the affidavit of the expert pointing out in detail the several items of surface resemblance, but inner differences of quality, between the competing knives.

such interim safeguards,[2] the substitution of upper for lower court findings, and the objections to any possibility of distinctive design in cutlery, indeed the strong skepticism expressed as to any secondary meaning notwithstanding the record, force me to conclude that no "likelihood of confusion" —the governing requirement—will ever be accepted as possible unless a strong showing of actual confusion from the persons confused is made. That means that even the rawest copying will not be actionable. And that is new law, as the cases cited in the opinion show.

I wish I could be as certain as my brethren that a green light to "free-riders" is of the essence of a competitive society and that we have a duty to carry out this high public policy. But, as my opinions show, I am bothered by troublesome doubts. Much of modern advertising offends my sensibilities; on the other hand I cannot develop enthusiasm for the manufacturer who would rely on the advertising of others to market a poorer product, even at lesser price. Placed in such dilemma, I would like to yield my views of public policy to those closer to both producers and consumers than I. I have thought to see such possible definitive instruction in the Lanham Trade-Mark Act of 1946, in its emphasis upon remedies against use of copies of trade-marked articles "likely to cause confusion or mistake," 15 U.S.C.A. § 1114, or use as to "any goods or services * * * a false designation of origin, or any false description or representation," 15 U.S.C.A. § 1125(a), or even more broadly "effective protection against unfair competition." 15 U.S.C.A. §§ 1126(h, i), 1127.[3] See, e. g., my discussions in Dad's Root Beer Co. v. Doc's Beverages, Inc., 2 Cir., 193 F.2d 77, and S. C. Johnson & Son v. Johnson, 2 Cir., 175 F.2d 176, certiorari denied 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527. One does not need to discover an exact remedy for this plaintiff in that Act (though compare discussion of 15 U.S.C.A. § 1126 in the Root Beer case) to conclude that the congressional policy there disclosed is other than that represented in the substantive aspects of the decision herewith.

2. In granting a stay pending appeal, first a single judge and then this court attempted to set such safeguards. Whether or not the attempts were successful, it is significant that these are now completely repudiated.

3. While the last sections cited have not yet received definite interpretation, the first two admittedly broaden a plaintiff's rights of protection against unfair trade.