**44**

**In re Petition for Naturalization of
KWONG HAI CHEW.**

**No. 763436.**

United States District Court
S. D. New York.

Dec. 20, 1967.

Anargyros E. Camarinos, General Atty., Immigration and Naturalization Service, New York City.

Ira Gollobin, New York City, for petitioner.

## OPINION

WEINFELD, District Judge.

This is another chapter, hopefully the last, in the saga of Kwong Hai Chew. His matter has been before the courts for almost twenty years. It has involved deportation proceedings,[1] numerous writs of habeas corpus.[2] and now the instant naturalization proceeding, and in between a perjury charge arising out of his testimony in the deportation proceeding—a charge rejected by a jury in this court. The current situation arises out of the diametrically opposed recommendations to this court by two officers of the Immigration and Naturalization Service— one recommending that Chew's petition for naturalization be granted; the other that it be denied.

Chew, a native and citizen of the Republic of China, first entered the United States in 1941 at New York City as a nonimmigrant crewman. He thereafter registered for the draft and did not claim exemption as an alien. During World War II, from 1943 to 1945 he served with credit in the United States Merchant Marine. He sailed in war zones, and on one voyage, after his ship was torpedoed,

---

1. The exact nature of these proceedings, whether exclusion or expulsion, has never been authoritatively resolved. See Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953), reversing 192 F.2d 1009 (2d Cir. 1951); Kwong Hai Chew v. Rogers, 257 F.2d 606 (D.C. Cir. 1958); United States ex rel. Kwong Hai Chew v. Shaughnessy, 113 F.Supp. 49 (S.D.N.Y.1953).

2. See United States ex rel. Kwong Hai Chew v. Shaughnessy, 113 F.Supp. 49 (S.

D.N.Y.1953); United States ex rel. Kwong Hai Chew v. Colding, 105 F.Supp. 857 (E.D.N.Y.1952); United States ex rel. Kwong Hai Chew v. Colding, 98 F.Supp. 717 (E.D.N.Y.1951); United States ex rel. Kwong Hai Chew v. Colding, 97 F.Supp. 592 (E.D.N.Y.), aff'd, 192 F.2d 1009 (2d Cir. 1951), rev'd sub nom. Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953).

spent four days at sea in a lifeboat before he was rescued. His war service received Presidential recognition. He married his present wife, a native born citizen, in 1946. In March 1948 he was granted suspension of deportation.[3] His status was adjusted to that of a lawful permanent resident of the United States as of January 10, 1945. In 1946 he was elected a patrolman [4] of the National Maritime Union when he ran on the incumbent administration ticket, but was defeated in 1948 when he ran for the same office on another ticket. In April 1950 he filed a petition for naturalization.

Chew's encounter with bureaucratic process and long journey through the courts began in November 1950, when he signed on as chief steward aboard a merchant vessel, the SS Sir John Franklin. This was only after, in accordance with existing regulations, he had been screened and cleared by the Coast Guard.[5] The vessel sailed and, after stop-offs at various Far Eastern ports, reached San Francisco in March 1951. There the Immigration Service, acting on behalf of the Attorney General, ordered Chew "temporarily excluded" as an alien whose entry would be prejudicial to the United States. He was detained aboard the SS Sir John Franklin until she reached her home port in Brooklyn, New York. Upon arrival there the Attorney General ordered Chew's "permanent exclusion." He denied Chew any information as to the nature of the charges against him and denied him a hearing or the opportunity to be heard in opposition to the exclusion order. The denial of information and a hearing was based upon the view that Chew, having been absent from the United States during his service aboard the SS Sir John Franklin, was now seeking readmission; that consequently his matter was governed by the exclusion process under which the Attorney General had authority to refuse Chew a hearing or an opportunity to be heard when he determined, as he did, that the exclusion order was based on confidential information, the disclosure of which would be prejudicial to the public interest.[6] Chew was ordered detained at Ellis Island "for safekeeping on behalf of the master of the SS Sir John Franklin." He was also denied bail by the immigration authorities; one court, reluctantly sustaining the legality of Chew's detention, likened the process to a "star chamber determination." [7]

The case made its way through the courts [8] with adverse results to Chew until the Supreme Court, in February 1953, held that Chew's previous status as a lawful resident continued for constitutional purposes despite his temporary absence out of the country while serving as a seaman aboard the ship, and that he was entitled under due process requirements to notice of the charges against him and a hearing thereon before an administrative tribunal.[9] Chew, during the entire time that the case wended its way to the Supreme Court, and even after determination of the hearings ordered by that court, was continued in detention at Ellis Island.

The hearings were conducted before a Special Inquiry Officer in March and April 1953; it was not until after the second session, on April 3, that Chew for the first time, more than two years after his detention, was apprised of the charge against him—that he was excludable as

3. See Immigration Act of 1917, § 19(c), as amended, 62 Stat. 1206 (1948) (now Immigration & Nationality Act of 1952, § 244, 8 U.S.C. § 1254).

4. This is a full-time paid job. The patrolman collects dues from the men aboard ship, distributes union literature and takes up grievances as to working and other conditions with higher authority.

5. See Exec.Order No. 10173, 15 Fed.Reg. 7005 (1950).

6. See 12 Fed.Reg. 5142 (1947).

7. United States ex rel. Kwong Hai Chew v. Colding, 97 F.Supp. 592, 594 (E.D. N.Y.1951).

8. See United States ex rel. Kwong Hai Chew v. Colding, 192 F.2d 1009 (2d Cir. 1951), affirming 97 F.Supp. 592 (E.D. N.Y.1951).

9. Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953), reversing 192 F.2d 1009 (2d Cir. 1951).

an alien who was a member of the Communist Party from 1945 through 1947, amended during the hearings to allege membership from 1943 to 1950.[10] Three witnesses, former members of the Communist Party, testified that between 1945 and 1948 Chew was a member of the Communist Party of the United States, Waterfront Section; that he was a dues paying member who attended at least one closed meeting; that he distributed Communist literature; that he ran for re-election on the Communist Party slate in the 1948 National Maritime Union election. Chew categorically and in detail denied he had ever been a member of the Communist Party; that he ever attended any meetings or paid dues; that he ever distributed Communist literature or ever engaged in any Communist activity. Chew also denied that he ran for office in the union as a Communist or on a Communist slate. He recognized the three witnesses as persons whom he might have known by reason of his union activities or might have seen at union meetings; he denied he knew they were Communists. His wife, his two brothers-in-law and two sisters-in-law, all American born citizens, testified they had no knowledge and no reason to believe that at any time he had been a Party member. The Special Inquiry Officer in April 1953 ruled against Chew, finding he had been a Party member from sometime in 1945 until sometime in September 1948, and consequently held Chew was excludable and ordered his deportation.

Chew, still under detention at Ellis Island, appealed to the Board of Immigration Appeals and, pending this appeal, again sought his release on bail; this was denied by the District Director of Immigration and Naturalization. He thereupon applied for a writ of habeas corpus and on June 5, 1953, more than two years after he had been "detained for safekeeping," this court ordered his release on bail pending final determination of his appeal.[11]

However, as bail was about to be posted to effect Chew's release, he was unexpectedly arrested on June 12, 1953 and arraigned before a United States Commissioner upon a complaint signed by an investigator of the Immigration Service, charging Chew with false swearing when he denied Communist membership at the hearing before the Special Inquiry Officer which had been concluded two months before—the very issue then sub judice before the Board of Immigration Appeals. Chew was held in additional bail on that charge. An indictment was not returned until five years later, within one week of the day prosecution would have been barred by the limitation period. Upon his trial in June 1959, at which the Service witnesses and Chew testified, he was acquitted.

On June 30, 1953 the Board of Immigration Appeals sustained the deportation order. But in May 1958 the District of Columbia Court of Appeals [12] reversed the order on the ground that the burden of proof had been erroneously and prejudicially placed upon Chew, and remanded and reopened the proceedings for consideration in the light of the Supreme Court's holding in Rowoldt v. Perfetto,[13] which required a finding of "meaningful membership" in the Communist party as a prerequisite to deportation. The hearings were resumed in 1961, and after a lapse of three years were continued in 1964; they were conducted before the same Special Inquiry Officer who presided at the 1953 inquiry. At the reopened

10. See Act of Oct. 16, 1918, 40 Stat. 1012, as amended, Internal Security Act of 1950, § 22, 64 Stat. 1006 (now Immigration & Nationality Act of 1952, § 212 (a) (28), 8 U.S.C. § 1182(a) (28)).

11. United States ex rel. Kwong Hai Chew v. Shaughnessy, 113 F.Supp. 49 (S.D.N.Y.1953).

12. Kwong Hai Chew v. Rogers, 103 U.S. App.D.C. 228, 257 F.2d 606 (1958).

13. 355 U.S. 115, 78 S.Ct. 180, 2 L.Ed. 140 (1957). See also Gastelum-Quinones v. Kennedy, 374 U.S. 469, 83 S.Ct. 1819, 10 L.Ed.2d 1013 (1963); Galvan v. Press, 347 U.S. 522, 528–29, 74 S.Ct. 737, 98 L.Ed. 911 (1954).

hearings the government dropped one of the 1953 witnesses, recalled one of them and produced a new witness, another ex-Communist, who also testified against Chew. Chew again dénied under oath that he ever had any Communist affiliation of any kind.

Chew's troubles seemingly were over when, on March 3, 1965, the Special Inquiry Officer concluded that Chew was not excludable on the ground he was a member of the Communist Party and was entitled to remain here as a permanent resident. Although the Special Inquiry Officer was of the view that Chew had been a voluntary member of the Party from "at least the spring of 1947 until the fall of 1948," [14] he held that the Service had failed to establish that such membership was "meaningful," and also had failed to overcome the possibility that his membership was devoid of political implication.

The fourteen-year effort to deport Chew having failed, he now looked forward to citizenship. He withdrew his April 1950 petition for naturalization and filed a new petition on May 19, 1965.[15] Accordingly, to gain citizenship, Chew's burden was to establish that from May 19, 1960 he was a person of good moral character.[16] The record persuasively establishes that upon the filing of his petition in May 1965 Chew had been law-abiding, industrious, a steady worker—a person of good moral character and entitled to his much coveted citizenship. Only events occurring after the filing of the petition have brought this in issue.

Chew testified before the designated Naturalization Examiner in support of his petition. He categorically denied Communist Party membership as he had in 1948 in the suspension of deportation application, in 1953 and again in 1964 in the deportation proceeding, and also in 1959 in the perjury trial; that he over attended meetings or paid dues; that he ever performed services in its behalf or ever ran for office on a Communist slate. His denials were not only categorical, but included a detailed refutation of the testimony of the Service witnesses. He understood the slate that he ran on for re-election in 1948 as patrolman was a "Progressive" slate concerned only with betterment of working conditions of the union members and not with political matters. He denied he knew the slate was made up of Communists, fellow travelers or Communist sympathizers. Indeed he testified he had been asked to run on the administration's slate, avowedly anti-Communist, but this was after he had already committed himself to run on the opposition slate, and felt honor bound to keep his word. Chew also testified affirmatively of his opposition to Communism at all times and of his loyalty and attachment to our government. The Service did not present witnesses before the Naturalization Examiner, but read into the record the prior testimony of three witnesses who had testified in the now terminated deportation proceeding, all of whom, as already described above, had identified Chew as a member of the Communist Party.

The Naturalization Examiner concluded that petitioner had sustained his burden of proof entitling him to citizenship; in particular, the Examiner found that Chew was not a member of the

---

14. In the 1953 decision, as already noted, the same officer found that he was a member "from sometime in 1945 until sometime in September 1948."

15. It is stated that the withdrawal of the April 1950 petition was suggested by representatives of the Service. In the light of subsequent developments it is charged that the Service, aware of Chew's earlier repeated denials of Communist membership, deliberately made the suggestion in order to revive the issue by again ques-

tioning him and to use his reiterated denial of Communist membership to charge him with false testimony in aid of his 1965 naturalization petition as a means of debarring him from citizenship—in effect a plea of entrapment. In view of the disposition made herein, the issue is not considered.

16. Immigration & Nationality Act of 1952, § 316(a), 8 U.S.C. § 1427(a). See Berenyi v. District Director, 385 U.S. 630, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967),

Communist Party and that the prior testimony of the witnesses offered by the government failed to overcome his prima facie case. The Naturalization Examiner specifically considered the issue of false testimony, in view of the conflict between Chew's testimony and that of the three Service witnesses, since the statute precludes a finding of good moral character where one testifies falsely in furtherance of his petition.[17] He found that petitioner, in denying membership, had not testified falsely. Accordingly, his recommendation was that Chew be granted citizenship.

The Regional Commissioner, upon the cold printed record, came to an entirely different conclusion; he recommended denial of citizenship. Since, as already noted, the record fully establishes that upon the filing of his May 1965 petition Chew was a person of good moral character, the only basis [18] upon which the Regional Commissioner's adverse recommendation could rest was that Chew no longer had that prime requisite of citizenship because he had testified falsely before the Naturalization Examiner—and the Commissioner so found, contrary to the finding of the Naturalization Examiner before whom Chew had testified.

■■■ Confronted with the conflicting findings and recommendations, the court is called upon to decide which are acceptable. The court, and not the Service, bears the responsibility for decision in granting or denying the petition for naturalization.[19] Where, as in this instance, conflicting recommendations are submitted to the court, it may, and upon the request of petitioner is required to, hold a de novo hearing.[20] Upon the return of this matter petitioner's counsel suggested that still another hearing would be unduly repetitious in the light of those already had in the various proceedings, at all of which Chew had testified always consistently in vigorous denial of the charges. The Service took no contrary view. The court agrees, particularly since neither petitioner nor the Service suggests that additional testimony by prior witnesses or any testimony by other witnesses would be forthcoming. On this aspect of the matter the Naturalization Examiner observed with respect to the three government witnesses:

"From my evaluation of their testimony * * * I am convinced that even if all three were recalled and testified in the same manner before myself and before the Court, it would still not establish that the Petitioner has testified falsely by denying membership in the Communist Party or attendance at meetings of the Communist Party." [21]

The issue for decision by the court is whether Chew knowingly testified

17. Immigration & Nationality Act of 1952, § 101, 8 U.S.C. § 1101:
   "(f) For the purposes of this chapter—
   "No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—
   *　　*　　*　　*
   "(6) one who has given false testimony for the purpose of obtaining any benefits under this chapter." See Berenyi v. District Director, 385 U.S. 630, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967).

18. As noted, the "* * * fall of 1948" was the latest date at which the Service was able to support its charge that Chew was a Party member. Perforce, the Regional Commissioner found that Chew's naturalization was not prohibited by § 313 of the Immigration & Nationality Act of 1952, 8 U.S.C. § 1424, which applies to those who within 10 years preceding the filing of the naturalization petition are members of the Communist Party or other proscribed groups.

19. Immigration & Nationality Act of 1952, § 335(d), 8 U.S.C. § 1446(d). See Petition of Zele, 127 F.2d 578, 580 (2d Cir. 1942).

20. Immigration & Nationality Act of 1952, § 336(b), 8 U.S.C. § 1447(b).

21. Findings of Fact, Conclusions of Law, and Recommendation of the Designated Naturalization Examiner, p. 8.

falsely in support of his naturalization petition when, at the hearing on June 2, 1966, and again at the continued hearing on April 26, 1967, he denied and reiterated earlier denials at the deportation proceedings of Communist Party membership, attendance at open or closed meetings and any activity or support of the Party. The issue is such that Chew, in order to meet the charge and so sustain his burden of proof of continuing good moral character, is in effect required to prove a negative.[22]

Resolution of the vital issue turns upon an evaluation of Chew's testimony and that of the three Service witnesses. The Naturalization Examiner and the Regional Commissioner each independently undertook that evaluation and came up with their divergent findings and conclusions. The Regional Commissioner found Chew's "general and sweeping denial * * * not credible in the face of the quantity and quality of the testimony of the three adverse witnesses." However, he conceded inconsistencies and contradictions, but brushed these off as "only minor inaccuracies which related to collateral matters * * *."

With respect to the testimony of the three Service witnesses and Chew, the Regional Commissioner's opportunity for appraisal is no better than the court's.[23] Accordingly, this court has read every word of the voluminous record in both the deportation and naturalization proceedings, including the various exhibits,[24] and upon that cold printed record finds it difficult to agree with the Commissioner's acceptance of the "quantity and quality" of the testimony of the Service witnesses and his rejection of Chew's credibility. The court is of the view that the inconsistencies were not "minor inaccuracies"; quite the contrary, they were of substance. They related to vital matters, including, but not limited to, significant dates and claimed events as to which documentary proof cast doubt that a witness could have attended a closed meeting which he testified Chew had attended. Another witness "recanted" as to a material item when taxed with a variance between his testimony at the deportation proceeding and at the perjury trial. These discrepancies and others noted in a careful analysis made by the Naturalization Examiner draw into serious question the credibility of the Service witnesses. The Examiner found that because of the conflicts and other shortcomings, their testimony fell far short of establishing that Chew attended Communist Party closed meetings, whether the testimony of each was considered by itself or in conjunction with that of the other two government witnesses.[25] This court's reading of the testimony leads it to agree with that appraisal.

But entirely apart from the foregoing, when it is noted that the Naturalization Examiner, fully sensitive to the con-

---

22. Cf. Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

23. See Lauricella v. United States, 185 F. 2d 327, 328 (2d Cir. 1950); Pfeifer Trans. Co. v. The Ira S. Bushey, 129 F. 2d 606 (2d Cir. 1942).

24. Also the transcript of the 3-day perjury trial. However, Chew's acquittal has been given no probative effect in view of the standard of proof placed upon the prosecution in a criminal case. Cf. Helvering v. Mitchell, 303 U.S. 391, 397, 58 S.Ct. 630, 82 L.Ed. 917 (1938).

25. The Naturalization Examiner, with respect to the 3 Service witnesses, was not unaware that the Special Inquiry Officer in the deportation proceeding had ac-

cepted their testimony as credible. His observation as to this is interesting: "It is recognized that the witnesses did appear before one Service officer, the Special Inquiry Officer during the exclusion hearing, and he considered them credible. Based on their testimony he found that the petitioner had been a member of the Communist Party but was not excludable because the Service had not established that his membership was 'meaningful' as heretofore mentioned. It can only be left for conjecture whether his finding, as to membership, would have been made if it would have resulted in a deportation order." Findings of Fact, Conclusions of Law, and Recommendation of the Designated Naturalization Examiner, p. 8.

flict between Chew's testimony and that of the Service witnesses in the deportation proceedings and the criminal charges against Chew arising therefrom, had the opportunity to observe Chew and to evaluate his demeanor, it is even more difficult to accept the contrary finding of the Regional Commissioner. This certainly is a case where demeanor evidence—always "an excellent clue to the trustworthiness of testimony" [26]—is of prime importance, and this court, after its thorough consideration of the entire record, finds no basis for rejection of the Naturalization Examiner's appraisal of Chew's credibility. Indeed, the Naturalization Examiner's finding that Chew did not testify falsely on the disputed issue is entitled to "maximum weight." [27]

Apart from the demeanor evidence, other factors give strong support to petitioner's negation of the charge of Communist Party membership and activity. Two governmental agencies called upon to investigate and consider Chew's status within the periods in question found no basis to attribute proscribed membership or conduct to him. In March 1948 the Service itself granted his application for suspension of deportation—action which required a finding of good moral character for five years prior thereto, and further that Chew was not a member of a subversive or any of the other proscribed groups.[28] And again, in November 1950, when screened for sailing aboard the SS Sir John Franklin, he was found not to be a security risk by the Coast Guard, whose specific duty was to weed out from among waterfront workers and seamen those whose presence aboard ship would be "inimical to the security of the United States." [29] While the favorable action of both agencies is not necessarily conclusive on the issue of Communist membership or activity, it has not been suggested that either agency failed to make its required investigation or that it was misled by any act or conduct of the petitioner or any other party.

Finally, the attempt to fasten Communist Party membership upon Chew based upon his candidacy for union office in 1948 on a slate opposed to the incumbent administration merits but brief notice. It rests upon the opinion, and nothing more,[30] that the opposing slate was that of the Communist Party, or sponsored by it or included known Communists and fellow travelers. The witnesses, taxed to name the Communists on the ticket, could identify, and then only vaguely, twenty-two out of a total of one hundred twenty-eight on that slate; and these were described either as Communists or fellow travelers. Chew testified, as has already been mentioned, as to the circumstances of his candidacy on the opposition or "Progressive" slate, as he termed it. His testimony on this score has not been challenged; nor has his testimony that following the defeat of the Progressive slate most of its candidates continued as union members and some were even appointed as officers by the union president, who was not only violently anti-Communist, but also engaged in a program of ridding the union of all known Communists. Chew remained a member of the union and was such when he sailed on the SS Sir John Franklin.

▪ Upon the entire record the court finds that Chew did not testify falsely in support of his naturalization petition; that he has sustained his burden of

26. NLRB v. Dinion Oil Co., 201 F.2d 484, 487 (2d Cir. 1952).

27. Cf. NLRB v. Majestic Weaving Co., 355 F.2d 854, 859 (2d Cir. 1966).

28. See Immigration Act of 1917, § 19(d), added by Act of June 28, 1940, tit. II, § 20(d), 54 Stat. 672; Act of Oct. 16, 1918, 40 Stat. 1012, as amended by 54 Stat. 673 (1940), 62 Stat. 268 (1948) (now Immigration & Nationality Act of 1952, § 212(a) (28), 8 U.S.C. § 1182 (a) (28)).

29. Exec.Order No. 10173, 15 Fed.Reg. 7005, 7007 (1950).

30. Cf. Reynolds v. Pegler, 223 F.2d 429, 435 (2d Cir.), cert. denied, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955).

proof that he is a person of good moral character and accordingly is entitled to be naturalized. He shall present himself to take the required oath of citizenship upon a date set forth in the order to be entered hereon.