James E. McDANIEL, Libelant,

v.

THE m/s LISHOLT, her engines, boilers, etc.,
THE A/S LISE, owner of said vessel, Claimant-Respondent.

United States District Court
S. D. New York.
Oct. 15, 1957.

Maclay, Morgan & Williams, New York City, for libelant.

Haight, Gardner, Poor & Havens, New York City, for respondents.

EDELSTEIN, District Judge.

1. On February 6, 1954, libelant was a member of the Fire Department of the Panama Canal Zone Government. He was twenty-five years old and had been with the Fire Department for about six months.

2. The m/s Lisholt is a Norwegian-flag vessel, built in 1949 at Malmo, Sweden. Its gross tonnage is 5,651. Its length is 462′ 2″ and its beam 61′ 8″.

3. At about 12:20 a. m. on February 6, 1954, while the m/s Lisholt was tied up at Dock 6, Balboa Docks, Panama Canal Zone, light diesel oil was pumped from fuel tanks ashore through hoses into the No. 3 starboard double bottom fuel tank of the vessel. At about the time the flow of diesel oil ceased, or 12:45 a. m., oil overflowed out of the sounding pipe of the tank and ignited. Neither the cause of the overflow nor the source of ignition nor the seaworthiness or unseaworthiness of the m/s Lisholt's engine room equipment need be determined inasmuch as claimant-respondent has admitted that it was jointly at fault with the Panama Canal Company in starting the fire. This concession was made solely for the purpose of this trial.

4. In the engine room at the time of the commencement of the fire were the ship's Third Engineer and a motorman. The Third Engineer attempted to fight the fire with a fire extinguisher, and the motorman went for assistance. The fire, feeding on highly inflammable oil and paint, quickly enveloped the engine room, driving the Third Engineer out.

5. The foreman of the Panama Canal Company bunkering section called the Canal Zone Fire Department at 12:47, or one minute after he and others noticed the fire on the ship. The elapsed time between the commencement of the fire, which occurred at about the time the light diesel oil delivery ceased, or 12:45 a. m., and the giving of the alarm was therefore two minutes. At least one minute was consumed by the bunkering foreman from the time he noticed the fire until the time he gave the alarm.

6. The vessel had a $CO_2$ fire extinguishing system for the cargo holds, but not for the engine room. There were five-gallon foam fire extinguishers in various alleyways and fire hose at various places throughout the ship. The engine room had several small foam extinguishers and one larger one. The fire hoses were inoperative because the vessel's pumping machinery in the engine room had been rendered unserviceable, except for the fire extinguisher used by the Third Engineer; the other extinguishers in the engine room could not be used because of the existence of the extensive fire in the engine room. The vessel had no fire-fighting system independent of the engine room.

7. The Panama Canal Company Fire Department responded promptly to the alarm and fought the fire in the engine room and in the superstructure, where it spread, until 5:30 a. m. on February 6, 1954, when the Fire Chief believed the fire to be under control. The fire was

considered extinguished by the Chief at approximately 8 a. m. on that day. The majority of the firemen remained on the vessel until approximately 9:30 a. m. Two men were left by the Chief as fire watchmen, and a rig was left on the dock. The fire caused extensive damage in the engine room and in the vessel's superstructure.

8. Some time between the time the fire was considered extinguished (8 a. m.) and the time the firemen left the ship (approximately 9:30 a. m.), an inspection or survey was made of the ship and compartments surrounding the fire and everything was found quiet. The Chief of the Canal Zone Fire Department said that one of his men entered "the outer compartment of the reefer" or chill box and found no sign of any fire. Captain Jones of the Fire Department made an inspection of the passageway that led into the refrigerating rooms but did not go into the rooms themselves.

9. The vessel's Chief Steward and Chief Cook entered the chill box and freeze box of the vessel between 9 and 10 in the morning for the purpose of checking the condition of the stores. They noticed "gas or smoke or something" in both the chill and freeze rooms. Since there was smoke in the corridors, in other rooms and elsewhere on the ship after the fire, they did not take much notice of it and did not suspect any danger. The Steward was not sure of the identity of the smoke or gas, but he knew that the refrigerant was harmless freon gas. They also noticed that on the outside of the chill-box door the adhesive applied over the cork insulation (described as bitumastic) "was running down". The Steward was emphatic in pointing out that the adhesive, which Exhibit N annexed to Libelant's Exhibit 1 shows to be asbestos cement, was running down outside of the chill-box door. He attributed this condition to the heat and saw no evidence of burning. As shown, the Fire Department also made an inspection of the outer compartment or chill box and necessarily passed through the same door and found no

signs of fire some time between 8 and 9:30 a. m. There is no evidence that anyone had any knowledge of a smoldering fire in the cork insulation of the chill or freeze boxes at the time of these inspections. It is therefore found as a fact that whatever progress any smoldering in the cork insulation could have made between 8 and 10 a. m., it was not apparent between those hours.

10. After the Chief Steward and Chief Cook inspected the meat in the freeze box and found it to be still frozen and found ice on the pipes, it was their opinion that the meat could be kept until Monday morning, February 6th being Saturday. The Steward reported to the Captain that there was nothing wrong with the meat, that there was still ice on the pipes, and that the meat looked hard. The Captain agreed, according to the Steward, that the meat could be left until Monday. The Master, who left the ship around 11 a. m. after being up for thirty hours, stated that the Steward reported to him that there was smoke or something that the Steward did not know in the chill and freeze boxes. The Master also testified that he talked with the Chief Officer, the Steward and the agent prior to 11 a. m. (when he left the ship) and that it was decided to take the provisions off as soon as it was safe, but that the time to do so was not decided. The Master believed at that time that there was so much smoke in the chill and freeze boxes that nobody could go down there.

11. It is conceded that neither the Master, Chief Officer nor the Chief Engineer or any other ship's officer made an inspection of the chill or freeze boxes on February 6, 1954, between the fire and explosion. The Chief Steward and the Chief Cook made the initial inspection and the Steward said the other officers did not concern themselves with the stores but left the matter to him.

12. Some time during the morning of February 6, 1954, a discussion took place between Kinsman, assistant to the superintendent, Terminals Division, Panama Canal Company, and Hignett, represent-

ative of C. Fernie & Company, general agents for the vessel in the Canal Zone about the removal ashore of the ship's refrigerated stores. Kinsman suggested that the meat be taken ashore inasmuch as his experience was that if it decayed the removal would be very difficult. Hignett requested Kinsman to supply a gang to remove the cargo of meat and vegetables. At about 11:30 a. m. Kinsman and Lorenzo Garay, a stevedore sub-foreman, and two other workmen opened the outer chill box, and Garay went in and found the box cold. A slight refrigerant odor was detected. The meat was still frozen. Kinsman then went out on the pier and told a group of men from the Industrial Division of the Panama Canal Company that he had noticed a freon odor or gas in the refrigerator room. He asked them if this was injurious to his men, inflammable or poisonous to the meat. He was answered "no" to each question and was advised that that was the reason why freon refrigerant was used. Hignett was present at that time and testified that Kinsman was advised that freon was harmful neither to man nor beast. Previously, after the fire had been considered extinguished, Kinsman had asked the Chief of the Fire Department if everything was all right and had been told that everything was, that the Chief was removing all the fire equipment except one rig and would leave two men standing by.

13. Around noon Kinsman told the Chief Steward that he was going to unload the provisions in the refrigerator rooms. The Chief Steward told Kinsman that they were not to do so until Monday, but was advised by Kinsman that authority had been given.

14. At approximately 2 p. m. the vessel was shifted from Dock 6 to Dock 14.

15. A stevedore sub-foreman entered the inner or freeze box at about 2:30 p. m. and reported to Kinsman that the meat was hard as a rock. About 3 p. m. the discharging of the stores from the provision and chill rooms commenced. Kinsman remained on the ship until about 4:15 giving instructions about the way to handle the work. He left the pier at 4:30 p. m.

16. The Chief Steward also supervised the removal of the stores from the provision and chill rooms. He did not enter the freeze box during the afternoon, the door being closed and dogged but not locked throughout the day. The Chief Steward left the area about a half hour before the explosion and turned over his duties to the Chief Cook, who left shortly before the explosion. Both men said they smoked in the provision and chill rooms and that others among the workmen smoked there too.

17. Meanwhile, at approximately 4 p. m., libelant returned to the vessel as a fire watchman. He was assigned there by the Fire Department of the Canal Zone Government. There is no evidence that he reported to the ship's officers when he came aboard. He relieved the fireman then on duty, who reported to him that all was quiet. It was libelant's job to make a top-to-bottom inspection of the ship for any rekindling or hidden fires. The fireman he had relieved had the same duty.

18. The Chief of the Canal Zone Fire Department and the former Chief of the New York City Fire Department, Harold J. Burke, called as an expert witness by respondent, agreed on the duties of a fire watchman. Chief Burke testified that in his experience both in civilian life, through all grades of the New York City Fire Department including the Marine Division, and in the United States Navy as head of its fire damage control program from the time of Pearl Harbor to the cessation of hostilities in 1945, the duties of a fire watchman are to guard against any rekindling of the blaze and to take care of any sign of hidden fires which might have been overlooked or hidden and not found. No distinction can be drawn between a fireman and a fire watchman. A fire watchman has to fight the fires he can handle and report what he cannot. Whether called "fireman" or "fire watchman", each

goes aboard the vessel for purposes of public safety and necessity regardless of the wishes of the owner of the premises.

19. Libelant denied he found any fire between 4 p. m. and the explosion. The transcript taken of his testimony at the Gorgas Hospital Conference Room on March 19, 1954, would indicate that he put out several small blazes or smolderings in that interval. Libelant said he was "rolled in" for the inquiry and was confused at the time. Gorgas Hospital nurses' notes for March 18 and March 19, 1954 show that libelant slept well, was active when awake, and visited other patients in the ward at will.

20. Stevedore foreman Cole came on duty about 4:30 p. m. Some time thereafter he told ship's agent Hignett that he was not too happy about the condition of the freeze box and that they had been in it but had closed it again. Hignett asked if a chemist had been sent for and blowers set up. Cole advised Hignett that lines were already laid for the blowers although they were not in the room. Panama Canal Company Industrial Division men had come aboard to rig lights, and they had been ordered to set up a blower in the refrigerating spaces to ventilate the area. The blower was not in operation.

21. Freeman, also a stevedore foreman, said he and Cole inspected the refrigerating box area; Cole went into the meat box, but Freeman would not go for the reason that there was an awful odor of gas in there. Freeman suggested to Cole that they call Kinsman or get a chemist.

22. Freeman then went up on deck and, recognizing libelant as a fireman, informed him that the men would not work in the meat box because of the presence of gas. Libelant and Freeman proceeded to the refrigerated space area; then he and stevedore foreman Cole opened and entered the freeze box to inspect conditions therein.

23. When libelant entered the freeze box, he detected what he believed to be an odor of ammonia gas which he believed to be highly explosive. He then went up on deck, his purpose being to report the condition to the fire department.

24. On deck libelant met the chemist and Freeman, and it was decided that a further investigation be made of the freeze box. Libelant and the chemist proceeded down into the freeze box, where libelant noted the odor was stronger and suggested that they leave. After proceeding from the freeze box into the chill box, libelant latched the door to the freeze box. Shortly thereafter a flash explosion ensued, in which libelant was severely burned. Cole and the chemist were killed. Three longshoremen were killed, and a number of others injured.

25. No evidence was produced at the trial about the actual igniting agent that caused the explosion. Several theories have been expressed: (1) One of the longshoremen struck a match to light a cigarette, but libelant and Freeman deny seeing anyone smoking or lighting a cigarette in the refrigerated space area; (2) heat from the lights in the chill room which were run from ashore; or (3) perhaps a short circuit in the lights. In the absence of positive evidence, no finding can be made on this point.

26. It is found as a fact that the ship had no light or power of its own following the fire and at the time of the explosion. Electricity and lights for illumination had to come from shore as did power to operate pumps or blowers and the pumps and blowers themselves.

27. At no time during the period of the investigation of the freeze box by libelant did he advise clearing the area or urge or caution the workmen against smoking, the only advice being to stop working and sit down, given by Cole, the stevedore foreman.

28. It is found as a fact that libelant, when he entered the freeze box for the second time believing he was entering an area of danger, nevertheless proceeded in the line of his duty as a fireman.

29. It is found as a fact that of all people who knew about or detected the

smoke or gas in the chill or freeze boxes of the m/s Lisholt only libelant believed the gas to be explosive, and, although he was wrong about the kind of gas, he was correct about the danger of explosion that existed.

30. No crew members were present during the investigation undertaken by libelant of the freeze box. There is no evidence that any ship's officer had any knowledge of libelant's suspicion of explosive gas or was ever asked to assist in his investigation.

31. There is no evidence that, up to the time of the explosion and even until an investigation had been completed thereafter, anyone knew what was producing the smoke or gas in the freeze and chill boxes. Even after the explosion a chemist could not identify the odor in the freeze box.

32. There is no evidence that anyone knew until after the explosion that the cork insulation in the interior of the wall of the freeze box had been smoldering progressively since the fire.

33. There is no evidence that anyone knew that the gas released from the incomplete combustion of the cork insulation was creating an explosive atmosphere consisting of carbon monoxide and other unknown gases.

34. It is found to be a fact that carbon monoxide gas is a product of incomplete combustion and is of itself odorless and colorless.

35. It is found as a fact and conceded by both sides that what caused the insulation in the freeze box to smolder was the heat radiating through the steel plates from the engine room fire below.

36. The analysis of the cause of the explosion was not made until after the explosion by a chemist who testified to his opinion ten days after the explosion, or February 16, 1954. The theory, according to the chemist, was only verified at every step since his initial investigation after the explosion.

37. The smoldering in the cork insulation which released the carbon monoxide gas was a direct result of the fire and was one of the hidden or undetected fires which libelant's duty as a fire watchman called upon him to investigate.

38. While libelant was aboard the m/s Lisholt, probably with the knowledge of the ship's officers, it can hardly be said he was there with the consent of the ship's officers or agent inasmuch as that consent could not be withheld and libelant, as representative of the Canal Zone Fire Department, could not be excluded from the vessel. Libelant was aboard the m/s Lisholt in the paramount or primary interest of the Panama Canal, the safety of its citizens, the preservation of shore installation, and the insurance of uninterrupted traffic through the Panama Canal, and only secondarily for the safety of the ship, which, at 4 p. m. on February 6, 1954, was an unseaworthy hulk with burned out engine room and superstructure, without power or light, listing and with water in the engine room and compartments.

39. It is found as a fact that the general practice is that a fire department does not relinquish control of the premises, whether land or seagoing, until the last fireman is withdrawn and a final inspection made. This control applies to the fire aspects of the premises, and the ship or landowner would exercise control over the non-fire phase of activities. The Master testified to this joint control. It is therefore found as a fact that libelant, as a representative of the Canal Zone Fire Department aboard the m/s Lisholt at the time of the explosion, was investigating a condition (a hidden fire) over which he had primary control and as to which he could even supersede the ship's officers. Illustrative of libelant's authority is the fact that he did not report the suspected ammonia gas to the ship's officers, but sought to report it to his own fire department, and also the fact that no ship's officer was sought, even in an advisory status, to participate in the investigation.

Conclusions of Law

1. The court has jurisdiction of the parties and the subject matter. The

claim is based upon what would be a maritime tort, if a tort at all.

2. Claimant-respondent concedes for purposes of this litigation that it was jointly at fault with the Panama Canal Company in starting or creating the fire. Claimant-respondent, however, owed no duty to libelant to refrain from carelessly starting fires on its vessel. No liability on claimant-respondent's part can therefore be predicated on its concession of fault because no duty was owing to libelant.

3. Libelant has raised the issue of a delayed fire alarm which caused the fire to spread more rapidly than it should. It has been found as a fact that the total interval between the commencement of the fire and the giving of the alarm by a Panama Canal Company employee was two minutes. Even if claimant-respondent owed libelant a duty of furnishing a prompt alarm, and even if it was the proximate cause of libelant's injuries, there is no evidence or reason to believe that a two-minute delay was unreasonable or negligent.

4. Libelant also claims that the ship was negligent in allowing the fire to spread out of control. Even assuming that a duty of due care to prevent the fire from spreading was owed to libelant and that the violation of the duty was the proximate cause of libelant's injuries, it is found that the activity of those in the engine room at the time of the fire, which spread very rapidly once started, was not unreasonable or negligent in the circumstances; and, considering the equipment available, the activities of the other crew members were not unreasonable or negligent in view of the fact that it became impossible to get into the engine room and considering also that the ship's machinery and pumps were rendered inoperative by the fire.

5. Libelant also claims that the m/s Lisholt violated the International Convention for Safety of Life at Sea, 1948, 3 U.S.T. 3450, TIAS 2495, concerning fire-fighting equipment and fire and boat drills. Claimant-respondent objected to any testimony on fire-fighting equipment recommended for cargo ships by the Safety of Life at Sea Convention, primarily on the ground that the date for full compliance by Norway for obtaining a Safety Equipment Certificate was not until November 19, 1954, or more than nine months after the fire and explosion on the m/s Lisholt. Libelant was then given an opportunity to show that the Convention applied to Norway at the time of the fire and explosion. Libelant later conceded that it did not then so apply for the fire-fighting equipment noted in the Convention and that Safety Equipment Certificates were not required for Norwegian vessels until November 19, 1954.

In any event it is apparent that the Convention was not designed for the protection or benefit of those who only come aboard while the vessel is in port or not "at sea". The Convention, by its name, by its terms and by interpretation, can only refer to those who sail with the vessel (passengers and crewmen) and who encounter hazards at sea with which the ship must alone cope.

The International Convention for Safety of Life at Sea, 1929, applied only to passenger ships, for Construction (Chapter II) and Life Saving Appliances (Chapter III).

6. There is no question, and claimant-respondent concedes, that the vessel was unseaworthy following the fire. The smoldering in the cork insulation in the wall of the chill and freeze boxes was an unseaworthy condition, as was the explosive atmosphere created thereby. However, no warranty of unseaworthiness was owing to libelant (a) because of his status, (b) because there could be no holding out of an admittedly unseaworthy ship as safe from hidden fires, when that possibility was so real that it was libelant's very purpose in being aboard, and (c) because it would be contradictory to say on one hand that libelant was a licensee and on the other to hold that he was entitled to an absolute,

non-delegable warranty of seaworthiness.

(a) Status of Libelant-Discussion of Factors in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

(1) Libelant was an employee of the Canal Zone Fire Department. No contractual or business relationship existed between the vessel and the Fire Department of the Canal Zone Government. Such relation did exist between the employer of the injured man and the vessel in Sieracki and in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. Public necessity brought libelant aboard the ship, not any contract to perform a ship's service. He was there primarily in the interest of the safety and protection of the Panama Canal, its citizens and installations and only incidentally in the ship's service.

(2) A ship at sea must be a more or less self-sustaining community. "Traditional ship's work" broadly interpreted could mean, therefore, any of innumerable housekeeping and service activities performed by seamen at sea, but by others in port. A ship by necessity must perform its own fire fighting, must have its own law enforcement authority and its own first-aid or medical service. If "traditional ship's work" be interpreted to mean anything done by a seaman and if that were the sole criterion, almost everyone with a legitimate purpose aboard the vessel would be entitled to a warranty of seaworthiness. A reading of the Sieracki and Hawn cases discloses no such sweeping intent. A demarkation line must be drawn between those shore people performing activities ancillary to the functioning of a vessel and those relieving the seaman of truly maritime functions, such as navigation, ship maintenance and loading and discharging cargo. It would not be unduly speculative to conclude that the average seaman goes through his nautical career without encountering many more fires than his land-dwelling brother. The truly traditional seaman's work noted, however, is a matter of daily routine.

(3) Another of the criteria mentioned by the Supreme Court in the Sieracki case is the helplessness of the individual covered by the warranty to ward off shipboard perils. In the circumstance of this case, however, claimant-respondent was helpless not only to make the ship seaworthy prior to libelant's coming, but also to prevent him from exposing himself to the perils of his calling, inasmuch as it could not exclude him from the vessel until such time as the vessel could be made safe and seaworthy for his inspection. Nor does libelant qualify, as do longshoremen and carpenters, under a theory of exposure to the hazards of maritime service. Libelant was only exposed to the hazards of rekindled or hidden fires, which is the same exposure he would expect on land. There is nothing peculiarly maritime about such hazards which could also be encountered if he were fighting a fire in a shore restaurant and entered the restaurant's meat box to find explosive gas.

(b) The test employed in Bruszewski v. Isthmian Steamship Co., 3 Cir., 163 F.2d 720, 722, is applicable here, that is, that the individual "is entitled to rely, and does rely, upon the seaworthiness of something actually unseaworthy." Libelant's job was to seek out, prevent or limit unseaworthy conditions arising from the fire. It would defy logic and libelant's purpose in being aboard the vessel to say that the one whose job it was to locate and eliminate fire dangers is entitled to a warranty from the ship that those dangers did not exist. See, also, De La Pena v. Moore-McCormack Lines, D.C.S.D.N.Y., 84 F.Supp. 698.

(c) In Lauricella v. United States, 1950, 185 F.2d 327, the Court of Appeals for the Second Circuit held that a longshoreman injured in a part of the vessel where he was not required to work or reasonably expected to go was a licensee in that part. The longshoreman fell through an opening made by the removal of a hatch cover. As a licensee he could not recover despite what was an unseaworthy condition. Were a licensee entitled to a warranty of seaworthiness, his status as a licensee and the limited duty owing to him thereunder would be

wholly nullified. One may not be a licensee and at the same time claim the warranty of seaworthiness. Kermarec v. Compagnie Generale Transatlantique, 2 Cir., 245 F.2d 175, 177.

7. Libelant, an employee of the Canal Zone Fire Department performing fire watch duties aboard the m/s Lisholt, was a licensee, perhaps what might be called a compulsory licensee. Libelant was not invited aboard the ship by ship's officers or owners. He was there by public necessity and in the primary interests of the Panama Canal Zone (Finding No. 38). Libelant has attempted to make a distinction between a fire fighter and a fire watchman as to licensee status. No distinction can be made (Finding No. 18).

■■ The great weight of authority in this country is that a fireman going on premises to fight a fire is a licensee.[1] See Prosser on Torts 629(1941); 65 C.J.S. Negligence § 34, p. 490. The real property concepts of trespasser, licensee and invitee have been carried over into relationships existing on seagoing premises as well. Kermarec v. Compagnie Generale Transatlantique supra (licensee); Lauricella v. United States, 2 Cir., 185 F.2d 327 (licensee); Anderson v. Lorentzen, 2 Cir., 160 F.2d 173, 174 (invitee); Rodermond v. United States, 3 Cir., 179 F.2d 955 (licensee); McFall v. Compagnie Maritime Belge, 304 N.Y. 314, 324, 107 N.E.2d 463 (invitee). Concurring in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 415, 74 S.Ct. 202, 98 L.Ed. 143, Mr. Justice Frankfurter refers to longshoremen as being able to sue in negligence as "business invitees". No difference appears in the cases in defining a seagoing licensee as against a licensee on shoreside premises. There is no conflict between a maritime definition of a licensee and, e. g., the New York view. See Kermarec v. Compagnie Generale Transatlantique, supra (maritime view), and Avlon v. Greencha Holding Corp., 2 Cir., 239 F.2d 616 (New York view.)

■ "The general rule is that the shipowner shall not wilfully or wantonly injure a licensee, or expose him to hidden perils or fail to use due care to prevent injury to him after discovering that he is in danger." Kermarec v. Compagnie Generale Transatlantique, supra, 245 F. 2d at page 178. There is no evidence of any wilful or wanton act by claimant-respondent here. Claimant-respondent had no duty to inspect in this case, not only because libelant was a licensee, but also because libelant was that rare visitor whose purpose and authority in coming aboard was to make the very inspection designed to unearth the hidden fire that injured him. In order to be under a duty to warn a licensee of hidden or unusual conditions, there must be an opportunity to give warning.[2] And there is no evidence that claimant-respondent had such an opportunity, or had actual knowledge of conditions within the walls of the chill or freeze boxes or of the fact that carbon monoxide gas was being generated by the hidden smoldering.

8. Because of libelant's profession as a fireman or fire watchman, he assumes the usual risks of his calling. These embrace not only the risks of an open blaze but, as a fire watchman, the risks of rekindled or hidden and undetected fires.

■ Libelant has argued that the defense of assumption of risks is not applicable to maritime torts. While this is generally true, it does not apply to risks which one's calling requires one to face.

---

1. In Beedenbender v. Midtown Properties, First Department, 1957, 4 A.D.2d 276, 164 N.Y.S.2d 276, 280, it was said: " * * * policemen and firemen must be treated neither as invitees nor as licensees, but as a special class, *sui generis*, privileged to enter the land for a public purpose irrespective of consent."

2. " * * * if the owner knows of the presence on the premises of officially privileged persons, such as firemen or policemen, is cognizant of a dangerous condition thereon, and has reason to believe that they are unaware of the danger, he has a duty to warn them of the condition and of the risk involved (Jenkins v. 313–321 West 37th Street Corp., 284 N.Y. 397, 31 N.E.2d 503; Schwab v. Rubel Corp., 286 N.Y. 525, 37 N.E. 2d 234)." Beedenbender v. Midtown Properties, First Department, 1957, 4 A.D.2d 276, 164 N.Y.S.2d 276, 281.

In Byars v. Moore-McCormack Lines, Inc., 155 F.2d 587, this Circuit, by relying on a decision of the State Court of Appeals, found no difference in the maritime rule and the New York rule on a repairman's assumption of risks inherent in a condition (whether negligently created or not) that he had undertaken to fix. Even, therefore, if libelant be viewed as something more than a licensee aboard the m/s Lisholt, as a fireman in a hazardous profession he assumes the usual risks of his calling. Within the accustomed or usual risks of a fireman's calling, no differentiation is made between fires negligently created and those not. In so far as the usual risks of his calling are concerned, the defense of assumption of risks prevails even for a seaman. Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 340, 75 S.Ct. 382, 99 L.Ed. 354; Roberts v. United Fisheries Vessels Co., 1 Cir., 141 F.2d 288.

9. Since claimant-respondent has breached no duty owed to libelant, the libel must be dismissed.