James E. McDANIEL, Libelant,

v.

THE M/B LISHOLT, her engines, boilers, apparel, etc., and THE A/S LISE, Respondent.

United States District Court
S. D. New York.

Dec. 28, 1959.

Maclay Morgan & Williams, New York City, for libelant (Hugh S. Williamson, New York City, of counsel).

Haight, Gardner, Poor & Havens, New York City, for respondent (Francis X.

Byrn and Thomas F. Molanphy, New York City, of counsel).

RYAN, Chief Judge.

This libel has been retried by this Court following remand from the United States Supreme Court (1959, 359 U.S. 26, 79 S.Ct. 602, 3 L.Ed.2d 625). Admiralty jurisdiction is based on the allegation of the commission of a maritime tort.

The libel had been dismissed by this Court upon a finding that respondent had not breached any duty owed to libellant. The Court found at this prior trial that libellant, as a shoreside fireman, was a mere licensee and that respondent owed to him only the duty of refraining from wilful or wanton negligence (McDaniel v. The M/S Lisholt, D.C., 155 F.Supp. 619, affirmed (2 Cir., 257 F.2d 538). The Supreme Court granted certiorari, reversed and remanded the suit to the District Court, citing Kermarec v. Compagnie Generale Transatlantique, 358 U. S. 625, at page 632, 79 S.Ct. 406, at page 410, 3 L.Ed.2d 550, decided one week earlier, which held that the licensee-in-vitee distinction was not a part of the maritime law and that "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case."

Both sides have stipulated that 29 of the 38 findings of fact, as they were set forth in the prior decision of this Court, were to be accepted in toto and another 4, with only minor deletions, were not in dispute and were, for purposes of this second trial, to be accepted as fact. We also, by consent, received in evidence the transcript of the evidence received at the first trial; the further evidence produced at the second trial was directed primarily to the question of damages.

Because of this stipulation of the proctors (the agreed facts, as determined by our learned colleague, are reported in 155 F.Supp. 619), we find it unnecessary to recite in detail all the evidence before us. Rather we will recite briefly, in the interest of clarity, those occurrences which gave rise to this suit and find, in detail, only those facts which were not stipulated and require our determination.

Libellant, James McDaniel, was a fireman, employed by the Panama Canal Zone Fire Department. On February 6, 1954, at about 12:45 A.M., a fire broke out on the M/S Lisholt, while she lay moored. Libellant, called to duty aboard the ship, fought the blaze until it was considered extinguished at approximately 8 A.M. This fire, for the purposes of this suit only, is admitted to have been caused, at least in part, by the negligence of respondent.

The Zone Fire Department made an inspection of the ship and the main contingent left at 9:30 A.M. Two firemen were left on the ship as fire watchmen and later in the day the number was reduced to one. McDaniel assumed the job of fire watchman at 4 P.M., on February 6, on direct orders from the Zone Fire Department and as one of its force.

At approximately 5:30 P.M., libellant was sought out by Freeman, one of the stevedore foremen, and requested to investigate the gaseous odor in the freeze box. This odor had become so strong that the men refused to work in there. Libellant entered the freeze box with stevedore foreman Cole and decided that the odor was that of ammonia, which he believed to be highly explosive. Libellant then went up on deck for the purpose of reporting the condition to his superiors in the Fire Department. This report was not made because, on deck, he met Freeman and a chemist and it was decided that a further investigation be made of the freeze box. Libellant again went below and, upon entering the freeze box, noted that the odor was stronger and suggested leaving. He latched the door to the freeze box. It was then that an explosion occurred. Libellant was severely burned over 40–50% of his body. For two weeks, he was not expected to live. He was a hospital inpatient for four months and an outpatient for another ten months. His hands were permanently disfigured and the movement

of his fingers has been restricted. He underwent two operations and his right little finger was amputated. His skin remains extremely sensitive and cold weather causes him great discomfort. If I were able to award him damages, I would set the amount in the sum of $102,-500.

The principal issues which could not be agreed upon are (1) the duties and authority of a fire watchman and (2) the igniting agent which acted as the mainspring in triggering the explosion.

Respondent called Harold J. Burke, a former Chief of the New York City Fire Department, as an expert witness. Chief Burke, remarkably well qualified because of his civilian employment and by his experience with the United States Navy in World War II, testified that the duties of a fire watchman are to guard against any rekindling of the blaze and to take care of any fire which might have been overlooked or hidden. A fire watchman is an on-duty fireman who has been given a special assignment. He is to fight all small fires he can handle and report to his superiors those which he cannot. Fire watchmen are commonly used by fire departments. In this case, McDaniel, as a fire watchman, was aboard the ship on the orders of his superiors for the purposes of public safety and regardless of the wishes of the owner of the vessel.

Chief Burke testified, and we find, that the fire department does not relinquish control of the fire aspects of the premises until the last fireman has been removed and a final inspection made. McDaniel, at the time of the explosion, was in charge of the investigation of the area in question. His authority, as to the fire aspects of this area, and that included the threat of explosive gas fumes, superseded even that of the ship's officers.

On the issue of what caused the gas to explode, no finding of fact can be made from the evidence presented. Among the theories expressed were (1) that someone had struck a match to light a cigarette, but any testimony on this point was refuted by directly opposite testimony by the same witnesses; (2) that heat from the lights in the chill room had ignited the gas; (3) that the lights had short circuited; or (4) that glowing cork had caused the gas to ignite. The multiplicity and uncertainty of the theories and the conflicting testimony do not lead us to any finding on this point.

■ Respondent's admission of fault, regarding the starting of the original fire, is not dispositive of liability in this case. Harper and James, Law of Torts, Vol. 2, 1956 edition (see pages 1501 to 1505), state:

"An occupier's negligence in starting a fire affords no ground of recovery for a fireman who is hurt while fighting it."

(See also Prosser on Torts, second edition, pages 461–462.)

Since the fire was considered extinguished at 8 A.M., liability must be founded on some other act or acts of negligence after that time and indeed it is under this theory that libellant presents his case.

The claim of liability is predicated on two theories: (1) libellant was owed the warranty of a seaworthy ship and/or (2) respondent was guilty of acts of negligence after the fire was considered extinguished. We hold that upon the evidence presented, liability cannot be predicated on either theory.

■ The warranty of seaworthiness, which is essentially a species of liability without fault, has been available in admiralty to seamen from an early date. This warranty has been extended to cover stevedores and others who do the type of work traditionally done by seamen. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L. Ed. 1099; Pope & Talbot v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143.

■ It cannot be said that McDaniel was doing any work traditionally done by seamen, therefore the warranty is not available to him. United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 1959, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541; Kermarec v. Compagnie

Generale, supra. As a professional fireman, he was on board for the purpose of public safety and regardless of any consent given or withheld by the owner. There was no relationship, contractual or otherwise, between libellant and respondent and the work performed by libellant was accomplished only after the ship was obviously unseaworthy. West v. United States, 80 S.Ct. 189.

The final issue to be determined and in reality the principal question raised in this suit, is whether there were any acts of negligence committed by respondent after 8 A.M. on February 6, 1954; which acts, or failures to act, were the cause of libellant's injury.

Libellant's theory is that respondent had notice of an unusual and potentially dangerous situation and was negligent in not inspecting the area where the condition existed and taking steps necessary to remedy the situation.

Libellant cites five instances of notice before the explosion. We hold that none but the last of these instances gave or should have given notice of the condition to the respondent, and that under the circumstances respondent's actions, at least toward the libellant in this case, did not constitute actionable negligence.

The first instance cited was a conversation between the Chief Steward and the Master at approximately 11 A.M. Since the fire had been extinguished only a short time before and the ship was still replete with the common after-effects of such a blaze (smoke and smoldering), a report that "there was smoke or gas or something" in the freeze box which was otherwise functioning properly, was not notice of an unusual or dangerous condition. The men who made this report were not alarmed (they returned to the area later) and this conversation would not prompt a reasonable Master to order an "inspection". Stipulated fact No. 10 [1], is substantially in accord with this finding.

The next three instances of notice were taken from the testimony of Garay, a stevedore. This testimony was contradicted by prior statements and, further, stipulated facts No. 12 [2] and No. 15 [3]

1. 10. After the Chief Steward and Chief Cook inspected the meat in the freeze box and found it to be still frozen and found ice on the pipes, it was their opinion that the meat could be kept until Monday morning, February 6th being Saturday. The Steward reported to the Captain that there was nothing wrong with the meat, that there was still ice on the pipes, and that the meat looked hard. The Captain agreed, according to the Steward, that the meat could be left until Monday. The Master, who left the ship around 11 A.M. after being up for thirty hours, stated that the Steward reported to him that there was smoke or something that the Steward did not know in the chill and freeze boxes. The Master also testified that he talked with the Chief Officer, the Steward and the agent prior to 11 A.M. (when he left the ship) and that it was decided to take the provisions off as soon as it was safe, but that the time to do so was not decided. The Master believed at that time that there was so much smoke in the chill and freeze boxes that nobody could go down there.

2. 12. Some time during the morning of February 6, 1954 a discussion took place between Kinsman, assistant to the superintendent, Terminals Division, Panama Canal Company, and Hignett, representative of C. Fernie & Company, general agents for the vessel in the Canal Zone about the removal ashore of the ship's refrigerated stores. Kinsman suggested that the meat be taken ashore inasmuch as his experience was that if it decayed the removal would be very difficult. Hignett requested Kinsman to supply a gang to remove the cargo of meat and vegetables. At about 11:30 A.M., Kinsman and Lorenzo Garay, a stevedore sub-foreman, and two other workmen opened the outer chill box, and Garay went in and found the box cold. A slight refrigerant odor was detected. The meat was still frozen. Kinsman then went out on the pier and told a group of men from the Industrial Division of the Panama Canal Company that he had noticed a Freon odor or gas in the refrigerator room.

3. 15. A stevedore sub-foreman entered the inner or freeze box at about 2:30 P.M. and reported to Kinsman that the meat was hard as a rock. About 3 P.M. the discharging of the stores from the provision and chill rooms commenced. Kinsman remained on the ship until about

cover this testimony and demonstrate that nothing unusual was found or reported.

The last instance is covered by stipulated fact No. 20 and it is conceded that notice of a condition involving escaping gas was given an agent of respondent at some time after 4:30 P.M. Although there was no knowledge of just what was the true condition of the freeze box, some action should have been taken at this time.

■ However, something was done. Respondent's agent inquired if a chemist had been sent for and blowers set up in the area. He was advised by Cole, a stevedore foreman, that lines had been set up for blowers, and that men of the Panama Canal Company had been ordered to set up a blower in the refrigerating spaces. These facts are found in stipulated fact No. 20[4]. These orders were given 15 to 25 minutes before the explosion. Since notice of the condition was given some time after 4:30 P.M. (most likely around 5 P.M.) and since respondent's agent inquired and was informed that blowers had been ordered installed and in fact this order had been given, we cannot say that respondent took no action. Therefore, there can be no finding of wanton or wilful conduct or conduct amounting to gross negligence. We do not pass on the question of negligence in not clearing the area of workers as that question is not before us for decision.

■ What duty did respondent owe McDaniel after notice of a gaseous condition had been received? McDaniel was not under the control of respondent. Respondent had no power to prevent McDaniel, as a representative of the fire department, from entering the area

where the explosion occurred. In fact, the natural thing would be to ask him to investigate this condition. Libellant, in entering the contaminated area, was fulfilling his duty as a fire watchman (to prevent a further outbreak of the blaze) and it was as a fire watchman that he was placed on the ship. Therefore, respondent owed, under the reasonable care test, only a duty to warn libellant of the condition. See Restatement of Torts, Section 343(d) (reasonable care owed to business invitee) and Section 345. Prosser on Torts, 2nd ed., Section 78 (duty owed to invitee). It seems that no matter what status is involved, a warning which is comprehended, or knowledge, at which point a warning is unnecessary, will fulfill the duty of reasonable care.

We hold that the libellant was warned; warned first by Freeman when he requested McDaniel to investigate the gaseous odor in the freeze box (no one knew or could have warned him of the explosive nature of the gas at that time) and warned by his own investigation of the area. This investigation revealed to libellant the presence of an explosive gas (he was mistaken as to the exact gas present) and at that point he left the area and went on deck to call the fire department.

When McDaniel entered the refrigerating area for the second time with the chemist, he knew, not only that gas was present, but that the gas present, and here we speak as to *his* state of mind, was explosive. He entered the area while on duty, with knowledge of a dangerous situation and in an attempt to fulfill his assignment. He was warned about this condition before he entered and knew of the danger from his own inspection. Therefore there was no neg-

---

4:15 giving instructions about the way to handle the work. He left the pier at 4:30 P.M.

**4. 20.** Stevedore foreman Cole came on duty about 4:30 P.M. Sometime thereafter he told ship's agent Hignett that he was not too happy about the condition of the freeze box and that they had been in it but had closed it again. Hig-

nett asked if a chemist had been sent for and blowers set up. Cole advised Hignett that lines were already laid for the blowers although they were not in the room. Panama Canal Company Industrial Division men had come aboard to rig lights, and they had been ordered to set up a blower in the refrigerating spaces to ventilate the area. The blower was not in operation.

ligence, to libellant, in the actions of respondent, and there can be no recovery. Cf. West v. United States, supra; Filipek v. Moore-McCormack Lines, 2 Cir., 258 F.2d 734.

Libellant appears to argue that the opinion in Kermarec v. Compagnie Generale, supra, creates one standard which is to be applied rigidly regardless of the status of the person affected. He urges that, if respondent was negligent as to the stevedores or members of the crew, it must be deemed negligent as to libellant. We do not think that the Supreme Court intended that a man's status and identity were to be wiped out simply by walking up the gangplank of a vessel in navigable waters.

Since respondent breached no duty owed to libellant, the libel must be dismissed. Let a decree be submitted on notice so providing, without costs.