Victor NIKIFOROW

v.

John F. RITTENHOUSE.

Civ. A. No. 40320.

United States District Court
E. D. Pennsylvania.

Nov. 21, 1967.

Harry Lore, Philadelphia, Pa., for plaintiff.

Thomas A. Reynolds, and J. Clayton Undercofler, III, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

JOHN W. LORD, Jr., District Judge.

This is a personal injury action brought by a member of the United States Coast Guard for injuries he sustained while attempting to tow defendant's yacht off of a sandbar. The yacht had run aground in Ludlam Bay, in the New Jersey inland waterway. Plaintiff alleges liability under two theories: negligence and unseaworthiness. The defendant yacht owner has vigorously contended that plaintiff is not within the class of persons protected by the doctrine of unseaworthiness and has asked dismissal of this phase of the case. Both parties concede that the question is one of first impression.

The accident occurred on August 25, 1965. Plaintiff was a member of the Coast Guard unit stationed at the Townsend Inlet, New Jersey, life boat station. He held the rank of seaman apprentice. On the day of the accident plaintiff and Coxswain Short were ordered by their superior officer to take a thirty foot utility vessel and go to the assistance of defendant's craft that had run aground.

The defendant had not summoned the Coast Guard, although he did have a radio on board. Prior to the arrival of the Coast Guard craft, the defendant had received some assistance from an unidentified boat, which had proven unsuccessful. The parties speculate that this boat had notified the Coast Guard.

Upon arriving at the scene of the grounding, the Coast Guard offered their assistance to the defendant. He accepted. The plaintiff then embarked from the Coast Guard boat, waded through the shallow water to defendant's vessel, and boarded it. He asked the defendant to answer a series of questions listed on a Coast Guard questionnaire. The defendant complied. The plaintiff returned to his own boat. Coxswain Short then asked the defendant whether the forward stanchion on defendant's boat was solid, as the Coast Guard would use this stanchion to anchor their towing rope. The defendant gave an affirmative answer. The plan proposed was to use the Coast Guard boat to pull defendant's vessel off the sandbar and into the channel. A line was thrown to the defendant. The defendant took the line, passed it through a bow deck cleat and then looped it around the stanchion. During one of the initial attempts to pull the boat free, the deck cleat on defendant's bow pulled loose. The Coast Guard boat changed position. After about fifteen minutes had elapsed, the Coxswain decided to attempt to pull the bow of defendant's yacht sideways across the bar, into the channel. During this operation some sideways movement of defendant's boat was observed. At this point the stanchion post suddenly broke loose and because of the tautness of the towing line flew into the cockpit of the Coast Guard boat, striking plaintiff in the eye, blinding him. This injury is the basis of the present suit.

Four motions are presently before the court: (1) plaintiff's motion for summary judgment, (2) defendant's cross-motion for partial summary judgment, (3) defendant's motion to strike plaintiff's claim based on unseaworthiness,

and (4) defendant's motion to join the United States of America as a third-party defendant.

■ The first three motions listed above all center around the question of whether, under the facts of this case, the plaintiff, a member of the Coast Guard, will be entitled to base his claim on the alleged unseaworthiness of defendant's boat. The plaintiff initially had attempted to present this issue to the court for determination in a motion to strike the defense that plaintiff had failed to state a claim upon which relief could be granted. Plaintiff's motion to strike was denied on January 4, 1967 on the basis that the " * * * motion is not intended to furnish an opportunity for the determination of disputed and substantial questions of law." 1A Barron & Holtzoff Federal Practice and Procedure (1960) § 369 at p. 508. Defendant's present motion to strike the unseaworthiness portions of plaintiff's complaint will be denied on the same basis.

■ Plaintiff's motion for summary judgment may also be briefly considered. A prerequisite to summary judgment under Fed.R.Civ.P. 56(c) is that " * * * there is no genuine issue as to any material fact * * *." Plaintiff has urged that this court can find that the defendant's boat was unseaworthy as a matter of law since the stanchion was not reasonably fit for its intended use. Villarosa v. Massachusetts Trustees of Eastern Gas & Fuel Associates, 39 F.R.D. 337 (E.D.Pa.1966); Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). Defendant has replied that since the Coast Guard boat had been able to apply a full power tow against the stanchion for about fifteen minutes before it pulled loose, the stanchion appeared "uncommonly sound". This court agrees with the defendant's argument to the extent that there still exists a material issue of fact as to whether the stanchion was "reasonably fit for its intended use" and that this issue must await resolution at trial. For this reason, plaintiff's motion for summary judgment will be denied.

Defendant's motion for partial summary judgment on the issue of unseaworthiness is based on his position that he " * * * is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This motion will be denied, for it is the opinion of this court that the plaintiff, under the facts as developed in this case, is entitled to the protections of the doctrine of unseaworthiness in his action against the defendant.

■ The defendant's motion for partial summary judgment squarely presents the issue of whether plaintiff is to be afforded the unseaworthiness protections that would be extended to him if he were a member of defendant's crew. The extension of the unseaworthiness protections to those other than crewmen has been a rapidly expanding area of law. See, Gilmore & Black, The Law of Admiralty (1957) § 6–1. See also, Note: Risk Distribution and Seaworthiness, 75 Yale L.J. 1174 (1966). Under the broad expansion inaugurated by the Supreme Court decision in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the proposition has become well established that unseaworthiness extends to anyone engaged in the service of the ship, if such service is one traditionally performed by the crew. Accord, Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953); Alaska S.S. Co., Inc. v. Petterson, per curiam, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959); Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); and Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967). This proposition has been recently phrased in the following language: "It is now elementary that all who do traditional seaman's work are owed, and may sue on, the warranty of seaworthiness." Biggs v. Norfolk Dredging Co., 360 F.2d 360, 364 (4th Cir. 1966).

*Sieracki* forms the focal point of analysis in the determination of extending the warranty of seaworthi-

ness to plaintiff. In *Sieracki* the Supreme Court extended the benefits of the doctrine of seaworthiness to a land based stevedore who had been employed by the stevedoring firm pursuant to a contract between the ship and the stevedore's employer. The rationale of the decision was that Sieracki was entitled to the protections of the doctrine of seaworthiness in the same fashion as a crew member, since he had been exposed to the risks and hazards of maritime employment identical to those traditionally encountered by the crew of the vessel. The Supreme Court conceded that the so-called "norm of liability" for unseaworthiness "has been historically and still is the case of the seaman under contract with the vessel's owner," pointing out, however, "that contract alone is neither the sole source of the liability nor its ultimate boundary." Id. 328 U.S. at 90–91, 66 S.Ct. at 875–876. One factor emphasized in *Sieracki* was that performance of "the ship's service" is done by an individual when such activity is rendered with the shipowner's *"consent or by his arrangement."* Id. at 95, 66 S.Ct. 872 (emphasis supplied). The Supreme Court concluded:

> Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew. [citations omitted] That the owner seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection. Id. at 96, 66 S.Ct. at 878.

The protections outlined in the *Sieracki* decision have been extended to situations where the injury did not occur on board the ship, but on the deck adjacent to the ship. Gutierrez v. Waterman S.S. Corp., supra. The doctrine was not extended to a repairman engaged in overhauling a ship's generators, since the Supreme Court concluded that the ship was a "dead" ship with its generators dismantled. United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959). Under the guidelines developed

in such decisions as *Sieracki,* the specific question facing this court is whether the plaintiff was doing the type of work traditionally done by seamen engaged in the service of their ship. West v. United States, 143 F.Supp. 473 (E.D.Pa.1956).

It is now a matter of common knowledge that, under the modern division of labor in the maritime industry, particularly in the case of small pleasure vessels plying the inland waterway, the United States Coast Guard has taken up the role of assisting a grounded vessel, instead of the disabled vessel seeking to free itself or seeking assistance from private sources. See, e. g., Petition of United States, 255 F.Supp. 737, 748–749 (D. Mass.1966). Traditionally, when a vessel became stranded, a crew was not able to abandon its obligation to serve its ship. The Davidson, 50 F. 323, 324 (D.Wis. 1880). Quite to the contrary, once a ship ran aground, the officers and crew had a duty to attempt everything within their means to free the vessel, whether by attempting to tow the ship free by manning the long boats, or by carrying out anchors and attempting to pull the vessel off the obstruction. The Ella Hand, 8 Fed.Cas.No.4,369, pp. 502, 503 (D. Fla.1837). Seamen are under a strict duty " * * * to exert themselves to the utmost to save their ship and cargo." Bertel v. Panama Transport Co., 109 F. Supp. 795, 797 (S.D.N.Y.1952), aff'd 202 F.2d 247, 248 (2nd Cir. 1953). Under the above precedents, it can be concluded that the plaintiff was performing a service to defendant's vessel, with the defendant's express consent and authorization, that traditionally would have been done by the crew of defendant's vessel, but that under modern division of labor such service is performed by members of the Coast Guard, especially in situations involving pleasure craft in inland waters.

It is important to note that the disabled ship situation in the present case is distinct from a normal towing operation. There is no indication that defendant's ship could not resume its normal course of navigation once it was freed from the

sand bar. Defendant's vessel was not a "dead" ship, nor was it in a position akin to a barge in tow, where a member of the barge crew might be hard pressed to demonstrate that he was also in the service of the tug and thus entitled to allege the unseaworthiness of the tug. Flanagan v. The H. F. Gilligan, 170 F.Supp. 793 (S.D.N.Y.1958) modified 170 F. Supp. 217 (S.D.N.Y.1959). See also, Williams v. Pennsylvania R. R. Co., 313 F.2d 203, 207, n. 3 (2nd Cir. 1963) (semble).

One final point remains. The defendant has argued that the doctrine of unseaworthiness should not extend to plaintiff because of his status as a United States Coast Guardsman. Defendant places his principal reliance on the case of McDaniel v. The Lisholt, 155 F.Supp. 619 (S.D.N.Y.1957), aff'd 257 F.2d 538 (2nd Cir. 1958) vacated 359 U.S. 26, 79 S.Ct. 602, 3 L.Ed.2d 625 (1959), on remand 180 F.Supp. 24 (D.C.1959), aff'd 282 F.2d 816 (2 Cir. 1960), cert. denied 365 U.S. 814, 81 S.Ct. 694, 5 L.Ed.2d 692 (1961.) McDaniel was a member of the Panama Canal Zone fire department. A fire had broken out on board the Lisholt while the ship was tied up in the Balboa Docks. After the fire had been extinguished, McDaniel had been placed on board as a fire watchman to warn of any reoccurence of fire. He was injured by an unexplained explosion while on board. The district court denied McDaniel the protections of the warranty of unseaworthiness, commenting:

> A demarkation line must be drawn between those shore people performing activities ancillary to the functioning of a vessel and those relieving the seaman of truly maritime functions, such as navigation, ship maintenance and loading and discharging cargo. 155 F. Supp. at 626.

The *McDaniel* decision is distinguishable on several grounds. In finding of fact number 38 the district court clearly indicates that McDaniel was not to be considered to be on board the Lisholt with the consent of the shipowners, since even if they wished to exclude him they could not have done so. Furthermore, the court noted that McDaniel was on board to protect " * * * the paramount or primary interest of the Panama Canal, the safety of its citizens, the preservation of shore installation, and the insurance of uninterrupted traffic through the Panama Canal, and only secondarily for the safety of the ship * * *." Id. at 624. This finding of fact led the court to conclude that McDaniel did not have the consent of the shipowner to be on board and that McDaniel was not exposed to the hazards of maritime service in the sense that a longshoreman would be exposed to maritime hazards. Both factors are distinguishable in the case at hand. Not only was the plaintiff rendering a service to defendant's ship with the express consent of the defendant, but the hazard leading to his injury was encountered in a peculiarly maritime situation—attempting to tow defendant's vessel off a sandbar and return it to navigation.

One distinction not discussed in McDaniel is that a government employee, such as McDaniel or the present plaintiff, is in no sense part of the economic enterprise of the vessel which he is assisting, as would be a crew member or a stevedore, whose economic interests parallel those of the shipowner. A crew member has special incentive to save his ship and its cargo, for if they are lost he loses his source of livelihood. Certainly a government employee is not so closely bound up in the economic enterprise of the ship he is assisting, since his livelihood is underwritten by a government payroll. Even so, the shipowner remains, as in *Sieracki*, in the better position " * * * as the worker is not, to distribute the loss in the shipping community * * *." 328 U.S. at 94, 99, 66 S.Ct. at 877, 879. In situations involving pleasure craft, this loss can readily be distributed as one of the operating costs of the vessel, if only expended in terms of maritime liability insurance. Nor is there some particular peculiarity in the fact that plaintiff is a member of the armed services that would compel this court to deny him the benefits of the

doctrine of seaworthiness that would otherwise be extended to an ordinary citizen. A clear analogy can be made with reference to a shore based member of the armed forces. If a soldier were driving an Army truck and the steering wheel broke because of a defect in its manufacture, causing the truck to crash, no court would bar his suit against the manufacturer of the truck based on appropriate negligence theories simply because plaintiff happened to be a member of the armed services. Equally true in the present case, no reason has been advanced why plaintiff, as a Coast Guardsman, is not to be granted the same seaworthiness protections that would be afforded any other person who came to defendant's assistance in a situation similar to that involved in the present suit. Any contrary result would be an unwarranted denial to members of the armed services of those legal protections freely afforded the non-military members of society. No meaningful distinction can be made between the status of a serviceman and an ordinary citizen for the purposes of affording one and not the other his day in court on the issue of the alleged unseaworthy condition of defendant's vessel.

The final matter pending before the court is defendant's motion to join the United States as a third-party defendant. As the defendant has candidly disclosed to the court, plaintiff cannot directly sue the United States since he is a member of the armed services. 50 U.S.C.A. § 551(2), Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1951). Under such circumstances, the United States is not liable for contribution or indemnity under the Federal Tort Claims Act. 28 U.S.C.A. § 1346(b); Drumgoole v. Virginia Electric & Power Co., 170 F.Supp. 824 (E.D.Va.1959); United Air Lines, Inc. v. Wiener, 335 F.2d 379 (9th Cir. 1964). Absent any indication as to how the United States is amenable to suit under such circumstances, defendant's motion to join the United States as a third-party defendant will be denied.