Howard KLARMAN, Petitioner and Third-Party Plaintiff,

v.

Rose SANTINI, Administratrix, and the State of Connecticut, Claimants,

v.

TOWN OF WESTPORT and Frederick Kellogg, Jr., Third-Party Defendants.

No. 4788.

United States District Court, D. Connecticut.

Aug. 16, 1973.

Pullman, Comley, Bradley & Reeves by Frederick L. Comley, Bridgeport, Conn., for petitioner and third-party plaintiff.

Robert Julianelle, Bridgeport, Conn. by Chester A. Hahn, New York City, for claimant Rose Santini.

Robert K. Marzik, Stratford, Conn., Haight, Gardner, Poor & Havens by Hollis M. Walker, Jr., Joseph T. Stearns, New York City, for third-party defendants.

OPINION

MURPHY, Senior District Judge.

A bizarre accident on the navigable waters of the Saugatuck River in Connecticut resulting in the death of one Aldo Santini triggered this complex limitation proceeding in admiralty.

In the late afternoon of July 26, 1964, Howard Klarman, owner of the 28-foot auxiliary sloop Fling, and several guests —his brother-in-law, two of his sons and two of their young friends—boarded the Fling at the Saugatuck Harbor Yacht Club, Westport Harbor, for a sail on Long Island Sound. The Fling, under power, headed south along the main channel of the Saugatuck River, and near Can No. 13 off Bluff Point ran aground while being conned by Klarman's brother-in-law. Klarman took command and tried unsuccessfully to motor her off. A private motor cruiser was hailed and tried, also unsuccessfully, to free the Fling by towing from her bow.

As the cruiser was attempting to free the Fling, Marine I happened on the scene. Marine I was a 26-foot launch powered by a 125 h.p. gas engine, owned by the Town of Westport and operated by the Police Department of Westport under the command of Frederick Kellogg, Jr., a member of the Westport Police Department. Aldo Santini, who was regularly employed by Bridgeport Brass Company as a presser, was aboard the Marine I as a volunteer member of the Westport Civil Defense, receiving on-the-job training as a voluntary auxiliary police officer.

Klarman hailed Officer Kellogg for assistance. Kellogg prepared a hand-written agreement [1] prior to rendering any assistance, which Klarman signed. Thereafter a line [2] approximately 28 feet in length and ½ inch in diameter with a bowline knot at one end and a back splice at the other, owned and selected by Klarman, was passed from the Fling to Marine I. The bowline knot was passed over the samson post in the bow of the Fling and the other end was secured to a towing bar in the stern of Marine I. The police launch thereupon commenced to pull forward and to port at approximately a 45 degree angle to the bow of the sloop for 15 or 20 seconds, without any success in freeing the Fling.

A second attempt was made, this time to pull the Fling from its stern. Klarman testified that he put the bowline knot on a cleat on the stern of the Fling and ran the line through a chock on the starboard side of the taffrail and then handed the other end to the Marine I, where it was made fast to her tow bar. Kellogg testified that Klarman used the starboard winch near the stern of the Fling and not a cleat. Marine I tried to free the Fling by towing it at a 40 degree angle to the Fling's port stern. Klarman, noticing the stress exerted on the chock by the line leading at an angle from it to the launch, called an end to that operation.

On the third attempt Klarman secured the bowline knot by doubling it on the port Merriman winch, located at the after end of the cockpit on the port side of the sloop. The other end of the line was still fastened to the police launch, and the towing was resumed, almost in a broadside direction. It was during this operation that the winch tore loose from its pedestal and was propelled toward the launch, striking Santini in the head and knocking him overboard. Santini was rescued and taken to Norwalk Hospital, where he died on August 1, 1964.

## PROCEEDINGS IN ADMIRALTY

On January 25, 1965, Klarman, as owner of the Fling, filed a petition in this Court for exoneration from, or limitation of, liability (46 U.S.C. § 181 *et seq.*). The value of the Fling was fixed at $7,500.

Rose Santini, as Administratrix of the estate of her husband, Aldo Santini, answered the petition on March 11, 1965. It was her claim that the death of her husband was due to the negligence of Klarman, and that Klarman had privity and knowledge of those events. She prayed therefore that Klarman's petition be denied and that she be compensated for her loss.

On May 19, 1965, the State of Connecticut filed its answer to the petition. It adopted Santini's allegations, and sought reimbursement out of any damages awarded to Santini for sums which the State had paid, or would become obligated to pay, under the terms of the Connecticut Workmen's Compensation Act.

On July 17, 1967, then Chief Judge Timbers granted Klarman's motion to implead the Town of Westport and Frederick Kellogg, Jr. into this limitation proceeding as parties who may be directly liable to Santini and as parties liable to Klarman by way of reimbursement or contribution. Petition of Klarman, 270 F.Supp. 1001 (D.C.Conn.1967). Accordingly, Klarman filed a third-party complaint alleging (1) on behalf of Santini a claim against the Town of Westport under the Jones Act (46 U.S.C. § 688) and the unseaworthiness of Marine I; (2) a claim for negligence on behalf

---

1. It read as follows:

"7/26/64 4:50 p. m. I owner of CT/3712–C accept full responsibility for my being towed by the Westport police boat. I accept and promise to pay for all damages which may occur. Owner H. Klarman."

2. Klarman testified that this line had been used in the earlier unsuccessful attempt by the cruiser and that it was his regular mooring line.

of Santini against Kellogg; and (3) on his own behalf he claimed that he was entitled to indemnity or contribution for any damages which Santini might recover against him.

Westport's and Kellogg's answer to the third-party complaint raised substantial defenses, *viz.*, (1) that the workmen's compensation payment precludes recovery, since it is the exclusive remedy under Connecticut law, Conn. Gen.Stat. §§ 31–180, 150a; (2) failure to give notice of claim to the municipality of Westport pursuant to Connecticut law, Conn.Gen.Stat. § 7–465; (3) release; (4) immunity under Conn.Gen. Stat. § 28–13.

Thereafter, Santini moved for summary judgment seeking dismissal of the petition of Klarman. This motion was denied on December 19, 1968 by Chief Judge Timbers. Petition of Klarman, 295 F.Supp. 1021 (D.C.Conn.1968).

On April 19, 1970 the parties agreed to a pretrial order which was made on that date.

On June 15, 1970 the third-party defendants moved to amend their answer to assert a claim for indemnity against Klarman based on the agreement Klarman signed. This motion was denied on January 18, 1971 by Chief Judge Timbers.

At trial Santini moved to amend her answer to the limitation petition to assert a wrongful death action under Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), which was decided after the filing of her answer, and to amend Klarman's third-party complaint so that Santini's claim would be in her own name and right. Westport moved to amend its third-party defendant's answer to assert laches under the General Maritime Law to the wrongful death claim and to amend to include a counterclaim for indemnity against Klarman based upon the contract signed by Klarman. Rulings on all of these motions were reserved by the Court and are now granted.

As a result, what was once a simple garden variety limitation proceeding has boiled into a veritable gallimaufry of real or imaginary admiralty claims and defenses. To deal with the issues in the simplest manner, we will recast Santini as if she was plaintiff, and Klarman, Westport and Kellogg were defendants.

Santini, either by her answer or as beneficiary of Klarman's third-party complaint, or under an amended answer, as requested at trial, is in effect suing Klarman, Westport and Kellogg as tortfeasors for the wrongful death of her husband. She claims her husband was killed as a result of the negligence of all three, Klarman, Westport and Kellogg, and/or the unseaworthiness of the Fling and/or Marine I.

Since different theories of liability are advanced, we will discuss them separately, and start with the Jones Act claim.

This claim of Santini's is against the Town of Westport and is based upon the statute, 46 U.S.C. § 688, which permits a seaman to sue his employer for personal injury caused by the employer's negligence, or in case of his death his personal representative may sue.

■■ Accordingly, the first question to be resolved is whether Aldo Santini was a seaman. The general rule relating to the navigable waters of the United States is that only a master or member of the crew is entitled to recover under the Jones Act. Jones Act, 46 U.S.C. § 688; Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 903(a)(1). "And it has been said that to be a member of the crew the vessel must be in navigation, there must be a more or less permanent connection with the ship, and the worker must be aboard naturally and primarily as an aid to navigation." Harney v. William M. Moore Building Corp., 359 F.2d 649, 654 (2d Cir. 1966).

■■ We will assume that Santini, although on board the Marine I as an on-the-job auxiliary police trainee, qualifies as a member of the crew. The sec-

ond test is whether he had any permanent connection with the launch. The cases hold that such a connection may be less than permanent. Weiss v. Central Ry. of N. J., 235 F.2d 309 (2d Cir. 1956), but on the contrary, it cannot be temporary or transitory. Bullis v. Twentieth Century Fox Film Corp., 474 F.2d 392, 394 (9th Cir. 1973); Rotolo v. Halliburton Co., 317 F.2d 9, 13 (5th Cir.), cert. denied, 375 U.S. 852, 84 S. Ct. 111, 11 L.Ed.2d 79 (1963); Thibodeaux v. J. Ray McDermott & Co., 276 F.2d 42 (5th Cir. 1960).

There is no dispute that July 26, 1964 was the only day that Santini was on the police launch. He had been an auxiliary policeman receiving on-the-job training for seven years, but never aboard any boat until this eventful day. Even on the day in question he was assigned to no specific duties. Despite the fact that he assisted on the first and/or second occasions to secure one end of the towing line, we hold that such activity was purely fortuitous.

The third requirement has been extended to those not necessary to the actual navigation of the ship but who are performing various services and are exposed to the unique hazards of work on the sea. Mahramas v. American Export Isbrandtsen Lines, Inc., 475 F.2d 165, 170 (2d Cir. 1973). Santini had no such duties. He was for all practical purposes really an observer and not a seaman. Accordingly, we hold that his widow has no claim under the Jones Act, even assuming that the Town of Westport was his employer.[3]

Santini has advanced a number of alternate claims based upon the doctrine of unseaworthiness. These claims are against Klarman because of the unseaworthiness of the sloop Fling, and the Town of Westport because of the unseaworthiness of the police launch Marine I.

Accordingly, it becomes relevant to define the terms and parameters of this type of claim.

■■ It is too late to argue that the modern American concept of the warranty of seaworthiness is without foundation. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 570, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960) (Frankfurter and Harlan, JJ., dissenting opinions). We start, therefore, with the proposition, "[t]hat the vessel and her owner are . . . liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship." The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903). It is a species of liability without fault, Seas Shipping Co. v. Sieracki, 328 U.S. 85, 96, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and wholly distinct from liability based on negligence, Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 498, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971). It is a condition which arises from a defect in a vessel's hull, gear, appurtenances, and in some circumstances her crew. "What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty

3. The Jones Act applies only between employees and their employers, Mahramas v. American Export Isbrandtsen Lines, Inc., 475 F.2d 165, 170 (2d Cir. 1973). The Supreme Court in Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 791, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949), made it clear that under the Jones Act only one person, firm or corporation can be sued as employer. "In determining a seaman's employer, a court must look to 'the plain and rational meaning of employment and employer,' *Cosmopolitan Shipping*, supra, [337 U.S.] at 791, [69 S.Ct. at 1321,] which means that the right of control is one of the most important factors to consider, United States v. W. M. Webb, Inc., 397 U.S. 179, 192 [, 90 S.Ct. 850, 25 L.Ed.2d 207] (1970); Savard v. Marine Contracting, Inc., 471 F.2d 536 [, 540] (2d Cir. 1972)." Mahramas v. American Export Isbrandtsen Lines, Inc., 475 F.2d at 171. There is no evidence that the Town of Westport did not have the right to control Santini while he was receiving on-the-job training as an auxiliary police officer.

is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel *reasonably suitable for her intended service*." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960).

In *Sieracki* the Supreme Court expanded the class of those who may avail themselves of the warranty of seaworthiness to all of those doing work traditionally performed by members of a ship's crew. In Usner v. Luckenbach, *supra*, the history of the *Sieracki* doctrine was summarized as follows:

"We may accept it as fully settled that a shipowner's liability for an unseaworthy vessel extends beyond the members of the crew and includes a longshoreman like the petitioner. We may accept it as settled, too, that the shipowner is liable though the unseaworthiness be transitory, and though the injury be suffered elsewhere than aboard the ship." 400 U.S. at 497–498, 91 S.Ct. at 516 (fn. omitted).

With these principles in mind, we should next determine whether Aldo Santini was a seaman, or a *Sieracki*-type seaman, in order to be able to claim the benefits of the doctrine of unseaworthiness. Although she is suing both owners (Klarman and Westport) on the claim that either or both of their crafts were unseaworthy, we need only consider her claim against Klarman, since later in our findings we hold that Marine I was not unseaworthy in any respect, and that the Fling was unseaworthy. The only question, therefore, is whether Klarman, the owner of the Fling, owed Santini the absolute right to a seaworthy sloop called the Fling.

Santini was not a member of the Fling's crew (assuming the Fling had a crew) and was never aboard her. We have been taught that a *Sieracki*-type seaman doesn't have to be physically aboard the ship to qualify. Gutierrez

v. Waterman S. S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). It is only logical that he must, in order to qualify, have been doing something for the Fling which can be characterized as seaman's work. We have a visceral reaction that the Supreme Court never intended, in its 25-year extension of the doctrine of unseaworthiness, to include Santini as a beneficiary. Yet there are two reported cases that experienced little or no difficulty in so extending the doctrine. Perhaps the only realistic test should be: Did the accident happen on navigable waters?

In Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011, 1022 (5th Cir. 1969), *petition for cert. dismissed*, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970), the doctrine was extended to an amphibious good Samaritan, that is, a land-based watchman who met his death on a barge moored to a pier on the Mississippi when he attempted to rescue an unknown worker in a wing of a tank on the barge. The Fifth Circuit (with now Chief Justice Burger as a member of the panel) held:

"Since in doing these humane acts, he was doing that which a seaman responding to the call of the sea would have done, he was, in a very real sense and in the *Sieracki*-sense, doing the work of a seaman. He can accordingly claim the rights of a vicarious seaman including that of the warranty of seaworthiness." 412 F.2d at 1022.

The other case is Nikiforow v. Rittenhouse, 277 F.Supp. 608 (E.D.Penn.1967), where, on a motion for partial summary judgment to strike plaintiff's claim based upon the unseaworthiness of defendant's pleasure cruiser, Chief Judge Lord held that the doctrine of unseaworthiness extended to plaintiff, a member of the crew of a Coast Guard cutter who was injured when the samson post of the stranded pleasure cruiser carried away and struck him during an attempt to tow her from a sand bar. Judge Lord's reasoning was as follows:

"Traditionally, when a vessel became stranded, a crew was not able to aban-

don its obligation to serve its ship. The Davidson, 50 F. 323, 324 (D.Wis. 1880). Quite to the contrary, once a ship ran aground, the officers and crew had a duty to attempt everything within their means to free the vessel, whether by attempting to tow the ship free by manning the long boats, or by carrying out anchors and attempting to pull the vessel off the obstruction. The Ella Hand, 8 Fed.Cas.No.4,369, pp. 502, 503 (D.Fla.1837). Seamen are under a strict duty ' * * * to exert themselves to the utmost to save their ship and cargo.' Bertel v. Panama Transport Co., 109 F.Supp. 795, 797 (S.D.N.Y.1952), aff'd 202 F.2d 247, 248 (2nd Cir. 1953). Under the above precedents, it can be concluded that the plaintiff was performing a service to defendant's vessel, with the defendant's express consent and authorization, that traditionally would have been done by the crew of defendant's vessel, but that under modern division of labor such service is performed by members of the Coast Guard, especially in situations involving pleasure craft in inland waters." 277 F. Supp. at 611.

With due deference, we cannot accept the reasoning of these two cases or believe the Supreme Court, after its "return toward sanity," as Judge Friendly puts it in Federal Jurisdiction: A General View, 131 n. 11 (1973) (citing Usner v. Luckenbach Overseas Corp., *supra*, and Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971)), would adopt such an extension of the concept of liability without fault.

But assuming the rationale of *Grigsby* and *Nikiforow* correctly forecasts the law in this recondite area, we find that Santini would not be encompassed within their holdings. What act of rescue can be attributed to him? What humane act was Santini doing in responding to the call of the sea? What service was he performing for Klarman's sloop, the Fling? The most we can say is that Santini was a spectator and a victim. He never heard the call of the sea. He never had a chance.

This resolution disposes of all of Santini's claims based on unseaworthiness, including her claim for unlawful death under *Moragne*, which extended the admiralty jurisdiction for such claims within State territorial waters.

 However, Santini also has a claim for wrongful death against Klarman based on Klarman's negligence. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). The negligence charged to Klarman is a grapeshot of allegations but very little proof. Principally the claim is that Klarman knew, or should have known, that the winch was improperly secured; that it was the wrong appurtenance or fixture to use as a strong point in a towing-off operation from a sand bar; that the tow rope, being of nylon, was an unsafe and dangerous appliance. We find, however, that Klarman's conduct was not negligent in any respect; that he acted in the manner of a reasonably prudent owner of a sloop that was grounded; that he did not know, or should he have known, that the winch was improperly secured to its pedestal; that, because of his prior use of the same winch for the same purpose and with a line, he reasonably could rely on its security; and that, as a matter of good seamanship, the winch was a proper appliance to use in the circumstances.

We find further that the line used was not nylon, and accept the testimony of Edgar Raymond that it was neither nylon nor dacron and that it was a synthetic product made by the Plymouth Rope Company. That it had a lower breaking strength than nylon or dacron and it would not stretch like nylon. Even if it was nylon it would have been a proper appliance to use for the tow in question.

 Klarman alleged, in his third-party complaint on behalf of Santini, a claim against Kellogg for negligence. We have considerable difficulty with

this claim because of the fellow servant rule; the Connecticut Workmen's Compensation Act, Conn.Gen.Stat. §§ 31–284 and 293a; the Longshoremen's and Harbor Workers' Compensation Act, 33 U. S.C. § 901 *et seq.* But these problems aside, the simple and short answer is that Kellogg was not negligent. We find that his conduct in attempting to free the Fling was in all respects proper, and that he exercised reasonable care and precaution and good seamanship in doing what he did to relieve the stranded sloop.

## UNSEAWORTHINESS

The major claims allege that both the Fling and Marine I were unseaworthy. The Fling because her port Merriman winch fastenings were inadequate and her line used as a tow line was unsuitable. The Marine I because her attempted towing was improper and lacking in good seamanship and was guilty of operational negligence which made her unseaworthy.

Five experts gave testimony in this case expressing their opinion on the seamanship of the tow that was employed, on the fitness of the winch that was involved, and on the fitness or appropriateness of the tow rope. They all agreed that the winch did not fail in any respect, but what failed was the winch's fastenings—the screws. We accept this evidence, and find also, by resolving the conflict between the experts, that the use of the winch in an effort to free the Fling was proper and in accordance with good seamanship, and also that the rope was not made of nylon and was a proper and suitable appliance to be used as a tow line. What remains, then, is, did the failure of the winch's fastenings— the six screws—make the Fling unseaworthy?

█ The winch was mounted on a wooden pedestal with six No. 10, ¾-inch wood screws. It was used primarily for sheeting the genoa sail. The genoa sheet or line led from the clew of the sail to a block on the rail and then horizontally along the deck to the winch. Thus, under normal sailing conditions the stress exerted upon the winch and screws was shear.

The screws which secured the winch to the wood pedestal, the experts agree, were too small in length and in diameter to give sufficient lateral support during the towing operation. This inadequacy of length and diameter of the screws, in conjunction with the lifting of the winch caused by the fact that the sloop was listing to port at the time of the accident, was the reason the winch tore loose. The above circumstances would cause compression on the outboard edge of the winch and tension on the inboard edge. The fact that the screws remained in the winch, with some slightly bent, indicates that the load was not shear at the moment of the accident.

Thus, we hold that the winch was inadequately fastened, and such inadequacy rendered the sloop unseaworthy. Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967); Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); Usner v. Luckenbach Overseas Corp., *supra.*

█ With regard to Marine I, we find that she was seaworthy in all respects; that Kellogg's actions in his three unsuccessful attempts to take the Fling off the sand bar were in all respects in accordance with good seamanship; that even if he had come aboard the Fling to check on the security of the appurtenances that were used to make the line fast, he would not have discovered any defect; that in applying the force that he did, he was acting within the standards of good seamanship; and that none of his acts amounted to operational negligence, assuming that that can create an unseaworthy condition, which we are satisfied the Supreme Court has not espoused.

Accordingly, the Clerk is directed to enter a decree dismissing all the claims

of Rose Santini as Administratrix etc. against the petitioner, Howard Klarman, and third-party defendants, Town of Westport and Frederick Kellogg, Jr.; dismissing all the third-party plaintiff's claims in his own behalf or on behalf of Rose Santini as Administratrix etc. against Town of Westport and Frederick Kellogg, Jr.; and dismissing the claim of the State of Connecticut; and that Howard Klarman, the petitioner, be exonerated from all liability; and judgment be entered in favor of Town of Westport and Frederick Kellogg, Jr.

Let this Opinion stand for our findings of fact and conclusions of law pursuant to Rule 52.